## UNITED STATES v. HAUPT et al.
### Nos. 8165–8170.

Circuit Court of Appeals, Seventh Circuit.
June 29, 1943.
Rehearing Denied July 23, 1943.

-

Paul A. F. Warnholtz and Frederick J. Bertram, both of Chicago, Ill., for appellants.

J. Albert Woll, Earle C. Hurley, and Richard G. Finn, all of Chicago, Ill., for appellee.

Before MAJOR, KERNER and MINTON, Circuit Judges.

MAJOR, Circuit Judge.

These defendants were jointly indicted, tried and convicted on a charge of treason. Separate judgments were entered and the defendants have separately appealed. Such appeals have here been consolidated. The defendants Hans Max Haupt, Walter Otto Froehling and Otto Richard Wergin were sentenced to death, and the defendants Erna Emma Haupt, Lucille Froehling and Kate Martha Wergin, each sentenced to imprisonment for a period of twenty-five years and each to pay a fine of $10,000.

The indictment contained one count, and in substance charged the defendants with adhering to the enemies of the United States and giving them aid and comfort, in that the defendants adhered to and gave aid and comfort to a spy for, and secret agent and saboteur of, the government of the German Reich, one Herbert Haupt.

All the defendants were born in Germany but became naturalized citizens of this country. Herbert Haupt was one of a number of saboteurs who were tried before a Military Tribunal in Washington, found guilty, and executed on August 9, 1942. He was the son of Hans Max Haupt and Erna Emma Haupt and a nephew of Walter Otto Froehling, husband of Lucille Froehling. He was not related to Otto Richard Wergin or Kate Martha Wergin.

Herbert Haupt, the alleged agent and representative of the government of the German Reich, came to the United States from Germany and made his appearance in Chicago at the home of the Froehlings on June 19, 1942. On June 27, he was arrested by agents of the Federal Bureau of Investigation (called F.B.I.).

Defendants in their brief state sixty-five contested issues, many of which are subdivided so that in reality the issues relied upon greatly exceed that number. Many of such issues could be readily disposed of as frivolous and without merit. There are a number, however, which raise serious questions concerning the validity of the proceedings and the trial. Most serious are the attack upon the indictment, the admission of statements procured from the defendants, the refusal of the court to allow a severance, and the court's charge to the jury.

The Indictment.

The indictment, containing one count, is predicated upon the following statutory provision: "Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason." 18 U. S.C.A. § 1.

Each of the defendants by demurrer attacked the indictment for improper joinder of parties and offenses, for duplicity in that the defendants in a single count were charged with separate and distinct crimes, and for want of certainty and particularity. The attack is renewed here.

While we do not think it necessary to set forth the indictment verbatim, it appears important to state its essential allegations. After its formal introduction, it alleges that the defendants (naming each of them) "* * * continuously and at all times from June 17, 1942, up to and including July 17, 1942, under the circumstances and conditions and in the manner and by the means hereinafter set forth, then and there being persons owing allegiance to the United States, in violation of their said duty of allegiance, unlawfully, feloniously, maliciously, traitorously and treasonably did adhere to the enemies of the United States, to wit, to the Government of the German Reich, its counselors, armies, navies, agents, representatives and subjects with which the United States, at all times since December 11, 1941, has been at war, and did give to said enemies aid and comfort * * *." Then follows an allegation as to the date when each of the defendants became a citizen and a resident of the

United States. Following this, the allegations concern the status of Herbert Haupt as an agent and representative of the Government of the German Reich.

Briefly summarized, the allegations in this respect are to the effect that Herbert Haupt on or about June 17, 1942 came into the United States and "served the Government of the German Reich as a secret agent, saboteur and spy, in the carrying on of its war with the United States." Such service contemplated, among other things, the destruction of war materials, premises and utilities of the United States, the receipt of money from the German Reich and the disbursement of such money in connection with the procurement, manufacture and use of explosive substances and sabotage devices for the destruction of United States war materials, and the recruiting and hiring of persons to engage in such hostile enterprises against the United States. Further, his services involved the securing and transmitting to the Government of the German Reich information concerning the national defense of the United States, and the employment of persons to assist in securing and transmitting such information. Also, his services involved the making and conveying of false statements and reports, and the employment of other persons to do likewise, so as to interfere with the operation and success of the military and naval forces of the United States.

The indictment then alleges that the adherence of the defendants to the Government of the German Reich, its counselors, armies, navies, agents, representatives and subjects, and the giving of aid and comfort by the defendants to the same, consisted "in their receiving, harboring, relieving and assisting Herbert Haupt, throughout said period of time, including the time from June 17, 1942, to July 17, 1942; in their aiding, abetting, assisting, counseling and advising Herbert Haupt in and concerning said service of said Herbert Haupt to the Government of the German Reich; in their countenancing said service; in their carrying out requests and instructions of said Herbert Haupt in connection with said service; in their giving false information regarding and concealing the identity of said Herbert Haupt, as a representative of the Government of the German Reich, and the mission of Herbert Haupt in the United States; in their receiving, holding, safeguarding and conceal-

ing the property and funds of said Herbert Haupt, and in misrepresenting and concealing the ownership of said property and funds, and in their maintaining and supporting the said Herbert Haupt throughout said period of time * * *."

It is then alleged that the defendants "when so adhering, and giving aid and comfort, to the Government of the German Reich" and its representatives, had knowledge of the status of Herbert Haupt, as theretofore alleged. Further, it is alleged that the defendants in the "prosecution, performance and execution of said treason and of said malicious, traitorous and treasonable adhering and giving aid and comfort," at the several times thereinafter specified "did do, perform and commit among others certain overt and manifest acts." Then follows an enumeration of forty-one overt acts. For the purpose of the present discussion, it seems unnecessary to relate or summarize such acts. It is sufficient to state that some of them are alleged to have been committed by all, some by a portion, and others by individual defendants. By way of illustration, thirty-one of such overt acts are alleged to have been committed by defendants other than Lucille Froehling, and thirty by defendants other than Walter Otto Froehling.

The most urgent attack upon the indictment is that the defendants are improperly joined, especially in a single count indictment. Defendants, in support of their contention in this respect, urge that the indictment shows on its face that they did not participate in, nor have they been charged with, all of the alleged offenses. A number of authorities are cited in support of the well-recognized rule that two or more defendants cannot properly be charged in the same indictment with distinct and several offenses. We need not discuss the rule of such authorities unless it is applicable to the instant situation. Its applicability depends upon a determination as to whether the defendants have been charged with separate and distinct offenses. This in turn depends upon whether the overt acts as alleged charge separate and distinct offenses.

■ We think defendants' contention misconceives the constituent elements of the crime of treason. According to the statutory definition, it consists in either (1) levying war against the United States, or (2) adhering to their enemies, giving them aid and comfort. This statutory def-

inition follows that contained in the Third Article of the Constitution. The Constitution, however, after defining treason, provides: "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in Open Court." § 3. Upon first reflection, this constitutional requirement might indicate that the overt act constitutes an essential element of the crime, but upon mature study, we agree with the government's contention that such is not the case. Certainly it is not included either in the statutory or constitutional definition.

The indictment charges the defendants, in the language of the statute, with "adhering to their enemies, giving them aid and comfort." The character of such adherence, aid and comfort, as well as the status of Herbert Haupt as an enemy representative and defendants' knowledge thereof, are meticulously and fully described. They are, perhaps, described in more detail than necessary. Without alleging any overt act, the crime of treason was thus charged.

The constitutional requirement "of two Witnesses to the same overt Act" forms no part of the definition of the offense. It relates solely to the proof required before a conviction can be had. The crime itself may be established in the same manner as any other crime, but before there can be a conviction, an act in its promotion must be established by two witnesses. In other words, the two-witness provision of the Constitution is an evidential requirement prerequisite to conviction. Moreover, the constitutional requirement "of two Witnesses to the same overt Act" appears to be an implied recognition that there may be more than one act committed in the execution of the offense. Otherwise, use of the word "same" would seem to be superfluous.

Since the overt acts constitute no part of the crime, it follows that only one offense is charged. In both United States v. Fricke, D.C., 259 F. 673, and Stephan v. United States, 6 Cir., 133 F.2d 87, the courts held good an indictment which charged a number of overt acts in the same count. It may be, as claimed by the defendants, that the question of misjoinder was not raised in those cases, but the validity of the indictment, in form quite similar to that of the instant case, was expressly sustained in the Stephan case. As the indictment charges only the single offense of treason, we see no reason why the defendants could not properly be jointly charged with its commission. Also, a single offense being charged, the indictment is not bad for duplicity. There is no merit in the contention that it is bad for want of certainty or particularity.

Defendants stress the danger inherent in being required to plead to such an indictment. The argument as to the difficulty of obtaining a fair and impartial trial under such circumstances is not without merit. This difficulty is emphasized from the fact that a large number of overt acts are alleged to have been committed by only some of the defendants. We are of the view, however, that this argument is not properly directed at the legality of the indictment. This is so for the reason that the court is empowered to prevent an injustice of this character by severance or other means at its disposal in the conduct of the trial.

## Defendants' Statements.

The treasonable acts were alleged to have been committed during the period subsequent to the arrival of Herbert Haupt in Chicago, up to and including a few days after his arrest. All of the defendants were interviewed by F.B.I. agents on numerous occasions and all, at one time or another, were taken into custody by such agents. Numerous written statements or confessions were obtained, fourteen of which were introduced in evidence at the trial. Four of such statements were made by Hans Max Haupt, four by Erna Emma Haupt, three by Walter Otto Froehling, two by Lucille Froehling, and one by Otto Richard Wergin. A statement procured from Kate Martha Wergin was not offered. The record does not disclose definitely when the defendants or any of them were taken before a United States Commissioner or a committing officer. From statements made in oral argument, however, it appears that none of them were taken before such officer until about August 1, 1942. It is certain that none were taken before an officer until several weeks after such statements were procured.

This brings us at once to the important question as to whether statements, thus procured, were properly admitted. Under the circumstances, we think there is no occasion to set forth their voluminous con-

tents. By leave of court, they were not included in the bill of exceptions but have been certified as original exhibits. As pointed out by the government, some are merely exculpatory in nature. Where such is the case, however, later statements made by the same defendant were highly incriminating. Not only were they incriminating as to the defendant who made the statement, but also as to other defendants, although the jury was told by the court, both at the time of their admission and in its charge to the jury, that they were to be considered only against the defendant making the statement or confession. For the purpose of the question we must now decide, it is sufficient to state that there is no doubt but that their contents, taken as a whole, were highly prejudicial and, if improperly admitted, necessitate a reversal.

The defendants contend that these extra-judicial admissions were improperly admitted under the authority of two recent decisions of the Supreme Court, McNabb et al. v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. ——, and Anderson et al. v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. ——, both decided March 1, 1943. The government contends that these cases are not controlling for the reason that each of the defendants freely and voluntarily executed a written waiver of custody and, as a result thereof, waived the right to be taken before a committing officer. Before considering the McNabb and Anderson cases, it appears pertinent briefly to summarize the facts in connection with the procurement of such statements. Such summary is taken largely from the government's brief.

Hans Max Haupt was taken into custody and to the headquarters of F.B.I. agents on June 28, at about 5 p. m. There he was questioned until 1:45 a. m. the following morning, when he signed his first statement. The questioning was not continuous, as some of the time was spent by Haupt in eating and some of it by the agents in typewriting the statement which he made. On June 29, he was again questioned by the agents and the second statement was procured. The time consumed on this occasion was about two hours. On June 30, 1942, he was interrogated for some two and one-half hours, when an agent commenced the dictation of material furnished by Haupt, which dictation continued for some four and one-half hours. After completion of the dictation, it was transcribed into typewritten form, which was completed at about 10:30 p. m. It was then read and signed by Haupt. This was the third statement procured from him.

In the early morning of July 1, 1942, Haupt was taken to and placed in a cell of the village jail at Winnetka, Illinois, a suburb of Chicago. On the evening of July 1, 1942, at about 8 o'clock, he was again interrogated by the agents. This is referred to by the government as a conversation with the agents, and continued until about 11:30 p. m. As the agents who participated in this conversation were not familiar with the case, an agent who was familiar was called. This agent arrived about midnight, and after some conversation with Haupt, the latter was taken to the office of the Chief of Police where the interrogation continued until about 1 a. m. July 2. About that time another agent arrived, who continued the interrogation until 2:30 a. m. Again the information furnished was dictated to a stenographer in the presence of Haupt and was finished about 5 a. m. Haupt was then taken to his cell to sleep while the dictated statement was being typed. This was completed about 8:30 a. m., when Haupt was again taken from his cell to the office of the Chief of Police where the statement was read to and signed by him. This was the fourth statement procured from him.

Erna Emma Haupt was questioned by agents at her home on June 28, 1942, and the first statement was procured. We are unable to ascertain how long she was questioned at this time, but it appears that she signed the statement at about 9:30 p. m. On June 30, she was questioned by agents from 11:30 in the morning until 4 o'clock in the afternoon, with some interruptions. A statement was prepared by the agents which Mrs. Haupt refused to sign, although she admitted, according to the testimony of the agents, that the contents of the statement were true. This unsigned statement was one of those admitted in evidence. On July 1, she was placed in the custody of F.B.I. agents, although permitted to remain at home. On that day, she was attended by a physician and arrangements were made for a nurse to care for her, although she did not appear to be nervous or ill, according to the testimony of the agents. Also on this day, a third statement was procured. On July 3, she was taken to the headquarters of the F.B.I. There she was locked in a detention cell,

where she was furnished with a frock and slippers supplied by the F.B.I. after her clothing had been taken away. While in this detention room, she was interrogated for about four and one-half hours and a statement procured, which was signed at 2 a. m. This was the fourth statement admitted in evidence against Mrs. Haupt.

Walter Otto Froehling was taken to the offices of the F.B.I. in the Bankers building, where he was interviewed from midnight until 1:30 a. m., June 28. A typewritten document was prepared and signed by him at 3 a. m. on that date. He was then returned to his home under custody of the agents. On the morning of June 30, he accompanied agents to the offices of the F.B.I. where he was again questioned from 10 o'clock in the morning until about 7 p. m., with some interruptions for lunch and dinner. This second statement was prepared by the agents and signed by Froehling at about 9:30 p. m. Subsequent to the signing of this second statement, Froehling was also taken to the Winnetka jail. The third statement was obtained from him while confined in this jail. The questioning which resulted in this statement took place in the office of the Chief of Police, participated in by him and the agents. The questioning commenced at about 8:45 p. m. and continued until about 1 o'clock the following morning. After the typing of the statement, which took approximately three hours, Froehling read the statement and signed it at about 4 a. m.

The first statement was procured from Lucille Froehling by the agents, at her home, on June 30, 1942. She was interrogated by the agents for two and one-half hours, it took an additional two and one-half hours to write up the statement, and she signed it at 6 p. m. After signing the statement, she was taken by the agents to the offices of the F.B.I., where she was permitted to see her husband. Later that evening, she was returned to her home by the agents and placed in custody of a matron. The second statement from her was procured on July 3, after the agents had interrogated her for about two hours.

Otto Richard Wergin was taken to the offices of the F.B.I. on June 30, 1942, where he was questioned for about two and one-half hours, and his statement was signed at about 11:45 p. m. Wergin was also taken to the Winnetka jail but there appears to have been no further statement procured

from him; at any rate, only one statement was introduced at the trial.

Kate Martha Wergin was questioned in her home on June 30, by agents, for about six hours. As already stated, no written statement made by her was introduced in evidence, and it appears she was not in custody at the time of the interrogation.

In addition to the written statements admitted in evidence, a number of agents testified as to oral statements made by the defendants after they had been taken into custody.

This brings us to a consideration of the pronouncement of the Supreme Court in the McNabb and Anderson cases. We shall first consider the applicability of the rule of evidence promulgated in those cases, and later the government's contention that even though applicable, the defendants waived any right which they had to the benefit of such rule. In the McNabb case, five brothers were charged with the crime of murder, three of whom were convicted. They were arrested by agents and officials of the Alcoholic Tax Unit of the Bureau of Internal Revenue, and, after much questioning, made written incriminating statements or confessions. In the trial court these statements or confessions were objected to as being involuntary. At a hearing out of the presence of the jury, the trial court decided against the defendants' contention and admitted the statements. The jury was charged that unless the statements were voluntary they were not to be considered. The judgment of conviction was affirmed by the Circuit Court of Appeals for the Sixth Circuit, 123 F.2d 848.

Application for certiorari was made to and allowed by the Supreme Court, as we understand, upon the issue as to whether the statements were voluntarily made. The Supreme Court, speaking through Mr. Justice Frankfurter, did not consider or decide the issue as raised in the trial court and as affirmed by the Court of Appeals, but reversed the judgment solely on the ground that the statements had been procured by the arresting officers prior to compliance with Sec. 595, 18 U.S.C.A., which provides: "It shall be the duty of the marshal, his deputy, or other officer, who may arrest a person charged with any crime or offense, to take the defendant before the nearest United States commissioner or the nearest judicial officer having jurisdiction

under existing laws for a hearing, commitment, or taking bail for trial * * *."

A few quotations from the opinion leave no doubt as to the reason for reversal. The court, in referring to the arresting officers, said [318 U.S. 332, 63 S.Ct. 613, 87 L.Ed. ——], "For in their treatment of the petitioners the arresting officers assumed functions which Congress has explicitly denied them." Referring to the purpose of the statutory provision above quoted, the court said, "It aims to avoid all the evil implications of secret interrogation of persons accused of crime." Referring to the manner in which the statements were procured, the court said, "The circumstances * * * reveal a plain disregard of the duty enjoined by Congress upon federal law officers." As to a conviction obtained upon such evidence, the court said, "Plainly, a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in wilful disobedience of law. Congress has not explicitly forbidden the use of evidence so procured. But to permit such evidence to be made the basis of a conviction in the federal courts would stultify the policy which Congress has enacted into law." True, the court later in its opinion stated, "The mere fact that a confession was made while in the custody of the police does not render it inadmissible." This statement undoubtedly refers only to a confession made subsequent to the officer's compliance with the statutory mandate.

If there be any doubt as to the holding in the McNabb case, and we think there is not, it is dispelled by the Anderson case, decided the same day. In the latter case, the defendants were arrested by state officers and their convictions reversed for the sole reason that confessions had been procured in violation of a Tennessee statute which prohibited a person's detention until examination before a magistrate. It may also be noted that the conviction in this case was reversed as to all defendants, although confessions were obtained and admitted only against some of them.

It is of some importance to note that the statutory mandate directed at the arresting officers in the McNabb case is less explicit and exacting in its command than the mandate directed at the officers in the instant case. The applicable statute in the former (heretofore quoted) merely requires the arresting officer "to take the defendant before the nearest United States commissioner or the nearest judicial officer having jurisdiction," while Sec. 300a, Title 5 U.S.C.A., authorizing officers of the Federal Bureau of Investigation to make arrests, requires that "the person arrested shall be immediately taken before a committing officer."

The government seeks to distinguish the McNabb case on its facts. True, it is related in the court's opinion that the defendants were uneducated, having gone no further in school than the third and fourth grades, and had spent their lives near home. In the instant case, we find nothing in the record as to the extent of the defendants' education, except that Walter Froehling attended grammar school in Germany until he was fourteen years of age, and night schools here for three years. Neither are we advised as to the extent of their travels except that they came from Germany to this country, but surely the Supreme Court did not intend to prescribe a test dependent upon scholastic attainments or the cosmopolitan aspect of a person's travel. As we understand the plain language of the opinion, it is bottomed solely on the premise of the arresting officers' nonobservance of the statutory command. Aside from the question of waiver, we think there is no escape from the conclusion that the statements admitted in the instant case were improper under these recent holdings of the Supreme Court.

We now consider the effect to be ascribed to the so-called waivers. The government's contention in this respect is stated in its brief thus: "It is the position of the Government that the decision in the McNabb case does not require the exclusion of the statements of these defendants because, as we shall fully show, they voluntarily waived the right to immediate arraignment, before any one of them made any incriminatory admissions."

To say that the record presents a confusing situation with reference to such waivers is a mild statement. Such confusion results, no doubt, in large part if not entirely, from the fact that the trial in the instant case took place prior to the decisions in the McNabb and Anderson cases. The rule announced in those cases was, therefore, not considered by the court or the parties. When the statements were offered by the government, counsel on both sides sought application of a test as to their

admissibility which has been recognized, so far as we are aware, by courts of all jurisdictions from time immemorial—that is, whether the statements were voluntarily made. This test was recognized and applied by the trial court, just as it was by the trial court in the McNabb case. Counsel for the defendants, just as did counsel in the McNabb case, made no contention that the statements were inadmissible from the fact that the arresting officers had failed to comply with the statutory mandate heretofore discussed. On the other hand, the government made no contention and no effort to show that the statements were admissible because of waiver. The fact is that there is little and perhaps no proof concerning waivers, except that which was developed by defendants' counsel in cross-examination of government witnesses. When the statements were offered, the court, out of the presence of the jury, heard Walter Froehling, the only defendant who offered to testify concerning the manner in which his statements were procured. The court decided that the statements were voluntarily obtained and properly admissible.

A consideration of these so-called waivers presents two questions: (1) does the record disclose that the defendants freely and voluntarily waived their right to be "immediately taken before a committing officer"? and (2) even so, can such waiver be utilized by the government to escape the pronouncement of the McNabb and Anderson cases?

Only one of the so-called waivers of custody was introduced in evidence, and that was executed by the defendant Walter Froehling. The importance of the matter justifies, so we think, setting forth this document in its entirety. It follows:

"Federal Bureau of Investigation
"United States Department of Justice
"Chicago, Ill., June 28, 1942.

"I, Walter Otto Froehling, do hereby consent to remain under the continuous physical supervision of the Special Agents of the Federal Bureau of Investigation, U. S. Department of Justice, without immediate arraignment, and at such place as may be designated by the said Agents, while information furnished or to be furnished by me regarding any violation of the laws of the United States is being verified.

"This I regard solely as a step necessary for my protection during the progress of this investigation and my consent to this arrangement is, therefore, freely given by me *without fear of threat or promise of reward.* It is, however, not to be construed as an admission of guilt on my part.

"The foregoing having been read by me and having been, thereby, a true and exact representation of my voluntary decision in the matter, of my own free will I herewith affix my signature in approval thereof.
 "Walter Froehling.
"Witnesses:
"B. D. Rice,
 Special Agent, F.B.I., U. S. Dept. of Justice.
"R. W. Axtell,
 Special Agent, F.B.I., U. S. Dept. of Justice."

There is testimony in the record developed, as we have stated, on cross-examination of government witnesses that all of the defendants signed a so-called "waiver of custody," but there is no proof as to the contents of the waivers signed by any of the defendants except Walter Froehling. During the course of the cross-examination, defendants' counsel requested government counsel to produce waivers signed by other defendants. This government counsel promised to do, but it was not done, or, if so, they were not offered in evidence. Without doubt, if counsel had been aware of the rule as later announced in the McNabb and Anderson cases, the course pursued as to the admission of defendants' statements would have been different. Defendants' counsel certainly would not have developed any facts as to these waivers or called for their production, and, on the other hand, government counsel would have sought their introduction, together with proof that they were freely and voluntarily made.

We think it would serve no good purpose to consider in detail the proof which the government relies upon to show a voluntary execution of these waivers. At no time were any of the defendants advised by counsel or otherwise as to their legal rights or what rights they were being deprived of by the failure of the arresting officers to immediately take them before a committing officer. Even if we assume, without proof, that all of the defendants other than Walter Froehling signed a waiver in the same form as that signed by him, the situation is little better for the government. This is shown by the document itself (heretofore set forth). It will

be noted in the first paragraph that he consents to remain in the custody of the F.B.I. "without any arraignment." In the second paragraph, the reason assigned for this consent is: "This I regard solely as a step necessary for my protection during the progress of this investigation * * *." This language casts a serious reflection on the claim that it was voluntary. Protection from what? The record is silent. Certainly it was not voluntary if he understood that this was a means of securing protection from some danger or violence. If it was represented to him as a means of protection when no protection was needed, it borders on the deceptive.

We shall refer to the circumstances concerning the waiver by Mrs. Haupt because they are perhaps more favorable to the government than those concerning the waiver by any other defendant. This is so because she is the only defendant who had an opportunity to converse with a disinterested person. Although such person was her family physician, he was not called as a witness. According to the testimony of the agent who procured her waiver, it was explained to her, and what it meant, although there is no testimony as to what was said by the agent in making the explanation. She was told that the waiver speaks for itself and that she would be under the constant custody and supervision of the F.B.I. The agent was not sure whether she read it. She was not told to consult a lawyer, but it was suggested to her that she consult her doctor. According to the agent, the doctor explained it to her, but again the record is silent as to what was said by way of explanation. The agent testified without explanation that the doctor understood exactly what was meant by a waiver of custody. The agent further testified that Mrs. Haupt signed the document under the advice of her doctor. There is no proof, other than the conclusions of the agent, that either Mrs. Haupt or her doctor was told or had any knowledge of the legal effect of a waiver of custody.

■ It must be kept in mind that the courts are extremely jealous as to the manner and circumstances under which a waiver is obtained. As was said in the recent case of Adams v. U. S. ex rel. McCann, 317 U.S. 269, 275, 63 S.Ct. 236, 240, 87 L. Ed. —: "The short of the matter is that an accused, in the exercise of a free and intelligent. choice, and with the considered approval of the court, may waive trial by jury, and so likewise may he competently and intelligently waive his Constitutional right to assistance of counsel."

A situation wherein a right is waived in open court "with the considered approval of the court" and where "competently and intelligently" made, is far removed from that of the instant case where the so-called waivers were procured in secrecy by agents of the government and without proof that those who signed such waivers were advised or had knowledge as to what, if any, rights were being relinquished.

■ It is argued by the government that the burden rested upon the defendants to establish that they did not competently and intelligently sign waivers of custody. The following cases are cited in support of this contention: Buckner v. Hudspeth, 10 Cir., 105 F.2d 396; Zahn v. Hudspeth, 10 Cir., 102 F.2d 759; and Harpin v. Johnston, 9 Cir., 109 F.2d 434. Those cases all involve habeas corpus proceedings wherein the petitioners were seeking release from the penitentiary because they waived a jury trial or the assistance of counsel. The cases were decided, as we understand, on the theory that the record of the court of conviction, showing such waiver, was presumptively correct and that the burden to overcome the record was on the one who asserted its invalidity. Here we have a far different situation. The government, for the purpose of escaping the pronouncement of the Supreme Court in the McNabb and Anderson cases, asserts that the waivers were voluntarily and freely made. We think under such circumstances the burden was on the government to maintain its assertion. In Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, the court said: "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.'"

Irrespective, however, as to which side carried the burden, we must hold there is no satisfactory proof that the defendants knowingly waived any right and no proof as to the contents of any waivers signed by the defendants other than Walter Froehling, and as to him, the document itself raises a serious question as to whether it was voluntary.

On the second phase of these so-called waivers, the government relies upon cases that an individual may waive such rights as that to trial by jury, to advice of counsel, to a speedy trial, and to be confronted with witnesses against him. In all such cases, however, wherein it has been held that there was or could be a waiver, the court was considering a provision which defined the *rights of the individual.* In both the McNabb and Anderson cases, the court considered statutes that defined the *duties of arresting officers.* How can it be said that one under arrest may waive the duties imposed by law upon the arresting officer? To so permit would mean that the duties of an arresting officer were dependent upon the action of the arrested person, rather than upon the action of Congress. In such case, the statutory requirement might be readily nullified merely by obtaining from the arrested person a so-called "waiver of custody." This would require consideration again of whether the waiver was voluntarily made and "competently and intelligently" entered into.

We think there can be little doubt but that the record fails to disclose a free and voluntary waiver on the part of the defendants. Moreover, we are certain that the claimed waivers did not relieve the arresting officers of the duty of complying with the statutory mandate. It follows that the situation comes squarely within the condemnation of the Supreme Court in the McNabb and Anderson cases.

 With all due deference to the Supreme Court, and especially to Mr. Justice Felix Frankfurter, the author of those opinions, we are constrained to state that we entertain grave doubts that this recently promulgated rule of evidence will result in any improvement to the administration of criminal justice. As pointed out by Mr. Justice Reed in his dissent to the McNabb opinion, "A frank and free confession of crime by the culprit affords testimony of the highest credibility and of a character which may be verified easily." In our judgment, this new rule will inure to the benefit of the guilty rather than the innocent, and will seriously impair the work of law enforcement officers. The Supreme Court, however, has clearly spoken and we must accept its pronouncement. By reason thereof, the statements procured from the defendants were inadmissible and their admission alone requires a reversal of these judgments.

### The Effect of a Joint Trial.

 Defendants urge that they were deprived of a fair and impartial trial as guaranteed by the Constitution. At this point it seems appropriate to emphasize that no principle is more firmly embodied in our system of jurisprudence than that a person shall not be deprived of life or liberty except upon a fair and impartial ascertainment of his guilt. Of the many rights guaranteed to the people of this Republic, there is none more sacred than that of trial by jury. Such right comprehends a fair determination, free from passion or prejudice, of the issues involved. The right is all-inclusive; it embraces every class and type of person. Those for whom we have contempt or even hatred are equally entitled to its benefit. It will be a sad day for our system of government if the time should come when any person, whoever he may be, is deprived of this fundamental safeguard. No more important responsibility rests upon courts than its preservation unimpaired. How wasted is American blood now being spilled in all parts of the world if we at home are unwilling or unable to accord every person charged with crime a trial in conformity with this constitutional requirement.

The inherent nature of the crime of treason, particularly when a person charged therewith is tried during a time of national crisis, is such as to greatly increase the obstacles to a fair determination of the issues presented. Such difficulties impose upon courts an increased responsibility commensurate with the increased difficulties. The danger was recognized in the beginning by inserting in the Constitution a provision which proscribed the conviction of a person charged with treason, except upon the testimony of two witnesses to the same overt act. This provision receives emphasis from the fact that no such protection was provided for a person charged with any other crime. The danger was also aptly stated by Chief Justice Marshall in the early days of the Republic, in Ex parte Bollman, 8 U.S. 75, 125, 4 Cranch 75, 125, 2 L.Ed. 554, where he stated: "As there is no crime which can more excite and agitate the passions of men than treason, no charge demands more from the tribunal before which it is made a deliberate and temperate inquiry. Whether this inquiry be directed to the fact or to the law, none can be more solemn, none more important

to the citizen or to the government; none can more affect the safety of both."

The crux of the attack upon the alleged unfairness of the trial revolves in the main around the court's denial of defendants' motion for severance. It is earnestly insisted that it was impossible under the circumstances for the individual defendants in a joint trial to obtain a fair and impartial hearing. We are mindful, of course, of the well-established rule that the matter of severance is one within the discretion of the trial court and ordinarily not subject to review. This discretion, however, like any other vested in the trial court is, if abused, subject to review and correction. The main argument as to the alleged unfairness of a joint trial has to do with the prejudicial effect of certain evidence offered by the government.

We shall briefly refer to some of the more compelling grounds upon which we think defendants' contention must be sustained. As already shown, there were introduced in evidence fourteen statements, the length of which it is difficult to describe. Some idea is obtained, however, from the fact that they comprise seventy-three pages (fifty-seven typewritten pages and sixteen handwritten), and that some three hours' time (so stated in oral argument) was consumed in reading them to the jury. As there is no dispute but that such statements, or at any rate most of them, were of a highly incriminating nature, no purpose could be served in relating their contents. They were not only incriminating as to the defendant by whom made, but in the main equally incriminating against other defendants. True, as the government asserts, such statements were offered in evidence only against the defendant by whom made, and the court instructed the jury accordingly. A reading of these statements, however, leaves no room for doubt but that they were damaging not only as to the defendants against whom offered but as to all others. We doubt if it was within the realm of possibility for this jury to limit its consideration of the damaging effect of such statements merely to the defendant against whom they were admitted. We have equal doubt that any jury, or for that matter any court, could perform such a herculean feat.

The holding of the Supreme Court in Anderson v. United States, heretofore discussed in support of our conclusion that the statements were improperly admitted, is also pertinent to the instant discussion. In that case there were eight defendants, some of whom had made confessions and some not. It was held, for the reasons heretofore stated, that the confessions were improperly admitted. The government contended, however, that even so the convictions should not be reversed as to those defendants, against whom no confessions were admitted. The court said [318 U.S. 350, 63 S.Ct. 602, 87 L.Ed. ——]: "The incriminating statement of each petitioner implicated all the others, including those who did not confess. To be sure, the trial court devised a procedure under which the confessions were introduced without mention of the names of the other persons implicated. But their names were in fact revealed in the course of the cross-examination of the confessing petitioners."

The confessions, as here, were admitted only against the persons who made them. The court, in denying the government's contention that the judgment should be affirmed as to the defendants against whom no confessions were admitted, stated: "There is no reason to believe, therefore, that confessions which came before the jury as an organic tissue of proof can be severed and given distributive significance by holding that they had a major share in the conviction of some of the petitioners and none at all as to the others. Since it was error to admit these confessions, we see no escape from the conclusion that the convictions of all the petitioners must be set aside."

If confessions erroneously admitted as to some defendants require reversal as to others against whom no confessions were admitted, it would seem equally plausible that the statements in the instant case, admitted as to certain defendants but incriminating as to all, would produce the same result. Moreover, one of the defendants in the instant case made no statement, or, if so, it was not introduced, and as to that defendant the situation is precisely the same as in the Anderson case. We are unaware of any procedure which the trial court could have devised, other than a severance, by which these incriminating statements could have been introduced against the defendants making them, without seriously prejudicing the rights of other defendants.

We refer to another line of testimony admitted against individual defendants but which must have been damaging to all.

It is labeled in the government's brief as "background of defendants." This testimony was admitted, so it is asserted, for the purpose of showing treasonable intent or the state of the defendant's mind. It covered an extremely wide field. In fact, as to some of the defendants, it reads as though they were on trial for the sins of a lifetime. We think much of it had no relevancy to the crime of treason. We are not now, however, considering or deciding its relevancy but its effect upon defendants other than those against whom it was admitted.

As to Hans Max Haupt, it shows he never renounced allegiance to his native country, and never acquired or had any loyalty for this country where he became a naturalized citizen. A situation is dramatically portrayed that is so revolting in its nature as to earn for him the utmost contempt of every loyal citizen. The sordid and disloyal utterances and activities of this defendant as proved could not have done otherwise than deeply stir the passions and emotions of a jury. We are not interested so much with the effect which this contemptuous background had upon his case, but we are concerned with the effect had upon other defendants who were tried with him. This is true to some extent as to all defendants, but particularly so as to Lucille Froehling. The most that can be said of her background is that she married a brother of Mrs. Haupt and was a close friend of the Haupt family. We find not a word in this so-called background testimony which is relevant to any treasonable intent on her part. The most that can be said of the defendant Kate Martha Wergin is that she was dissatisfied in this country and hoped some day to return to her native land, where resided her mother and other relatives. As to the defendants Walter Otto Froehling and Otto Richard Wergin, this background testimony may have some bearing upon the question of intent but it is insignificant when compared with that of Hans Max Haupt.

Here again, this background testimony as to each defendant was offered only as to that particular defendant and the jury was instructed that it was to be only so considered. We seriously doubt, however, if it was possible for the jury to limit its damaging effect to the particular defendant against whom it was admitted.

Inasmuch as these judgments are to be reversed, there is no occasion to relate the evidence with a view of ascertaining its sufficiency to sustain the judgments. A study of the record, however, is convincing that it is not sufficient as to one and perhaps more of the defendants. This is so, even though it be assumed that the incriminating statements were properly admitted. We express this opinion in connection with our conviction that the guilt of individual defendants was not determined merely on evidence properly applicable to such defendant. If we indulge in the rather violent assumption that the verdict of guilty as to all defendants was not produced by passion and prejudice, it must have been the result of the inability of the jury to segregate from the mass of evidence introduced that relevant to individual defendants and properly limit it thereto. Such was the inevitable result, under the circumstances of this case, of a joint trial.

The motion for severance filed by each of the defendants called the court's attention to the fact that all of the defendants were charged in the indictment as principals in the crime of treason, which indictment specified forty-one different overt acts, many of them alleged to have been committed by some one or more of the defendants but not all; that the introduction of evidence in a joint trial relating to said overt acts not alleged to have been participated in by all defendants might lead to confusion and prejudice as to those who had not participated in the said overt acts.

At the time the court ruled upon said motions, there was nothing before the court, as far as the record discloses, except the motions for severance and the indictment. The court's action and the exercise of its discretion are to be judged by the circumstances and facts thus presented. While a consideration of a motion for severance where several persons are charged jointly with the commission of the grave crime of treason and numerous overt acts are alleged to which some of the defendants were not parties, must challenge the trial court to the utmost care and caution, we cannot say that the court abused its discretion in overruling such motion.

However, after the trial and all of the evidence as to the so-called background of certain defendants had been heard and the fourteen incriminating statements admit-

ted and the overt acts had been considered, the defendants, by motion for new trial, again appealed to the trial court's discretion to relieve them of the unfair and prejudicial consequences of a joint trial. Then the court had to consider the task of the jury, which had to keep separated in its mind the involvement of the various defendants in the numerous overt acts, to eliminate from the incriminating statements those parts which involved defendants other than the one against whom such statement was admitted, and to consider only as to such defendant the acts and utterances comprising the so-called background testimony as it related to such defendant. We think that if these facts had been known to the trial court at the time the motion for severance was made, it would have been an abuse of discretion for the trial court to have refused a severance. When presented again in the motion for a new trial when all of these facts and circumstances were known to the court, it was likewise an abuse of discretion to overrule such motion and thus refuse to remedy this prejudicial procedure.

### The Court's Charge.

■■■■ One other matter we will touch upon, and that is the court's charge to the jury. Much of the criticism directed thereto overlooks the fact that the charge must be considered in its entirety. In some respects, however, the criticism cannot be so readily disposed of. One portion which we think deserves consideration is as follows: "Written statements made by certain of the defendants have been received in evidence. If you believe beyond a reasonable doubt that they were made, you are to consider each of these statements only as evidence of what they contain for or against the particular defendant making such statement."

This statement, apparently correct in an ordinary criminal case, is, standing alone, of dubious propriety in the instant case. The two-witness provision of the Constitution no doubt requires that an overt act be proven by two witnesses in open court. The act cannot be proven by confessions other than in open court, by documentary or circumstantial evidence even in conjunction with one witness who testifies in court.

The vice in the charge under discussion is that it places no limitation upon the right of the jury to accept a statement in proof of an overt act alleged against the defendant making the statement. The government in defense of this charge states: "The jury were told in most unequivocal language that they could not convict of treason on the statements alone." We have carefully studied the court's charge and we find no such language, unequivocal or otherwise. True, the jury were instructed that an overt act must be established by the testimony of two or more witnesses. It must be kept in mind that a number of F.B.I. agents testified in connection with the statements referred to in the court's charge. It is highly improbable that the jury, in deciding whether an overt act had been proven by two witnesses in open court, would be able to distinguish between such witnesses and those who testified in connection with statements made by the defendants. Unless such distinction was made, the jury, in following this charge, might well have treated the statements as proof of an overt act by the defendant or defendants against whom such statement had been admitted. The vice of this charge is further accentuated by the court's refusal to give the following instruction proposed by defendants:

"The Court instructs the jury that witnesses testifying to oral or written statements made by any of the defendants before the commencement of this trial, are not witnesses within the meaning of the constitutional provision which requires two witnesses to the same overt act for a conviction of treason.

"The court further instructs the jury that neither oral nor written statements made by any defendant before the commencement of this trial, which have been testified to by one or more witnesses, can be considered by the jury as a substitute for the requirement of the Constitution of the United States that 'No person shall be convicted of Treason unless on the testimony of two witnesses to the same overt act, or on confession in open Court.'"

■■■ We are of the view that this proposed instruction states a correct proposition of law. It was essential to the legal rights of the defendants. At no place in the court's charge were the jury told that statements made by the defendants could not be used as a substitute for the two-witness provision of the Constitution. We think that defendants were entitled to have the jury instructed in unequivocal language upon this important phase of the law of treason.

The government, in connection with this proposed instruction, points out that a number of overt acts charged the defendants with giving false and misleading information concerning the activities of Herbert Haupt, for the purpose of concealing his identity and mission in this country. It is argued that the proposed instruction would have eliminated the statements as proof of such acts, and would have made their establishment difficult, if not impossible. Under the authority of the McNabb and Anderson cases heretofore discussed, we doubt if the statements could have been used for this or any other purpose. The fact that such proposal might make it difficult or even impossible for the government to prove certain overt acts as alleged, is of little consequence. Evidently it was intended by the Constitution to make a conviction for treason more difficult than that for any other crime. Another matter to keep in mind in connection with the government's contention is that the jury were instructed that a conviction might be had upon proof of one overt act. The theory that the government's proof might have been eliminated as to certain overt acts, even if tenable, is no reason why the jury should have been permitted to consider the statements as proof of other overt acts.

■■■ Another portion of the charge is, to say the least, confusing, and we think states an incorrect proposition of law. After advising the jury that an overt act must be proven by two witnesses, the charge states: "However, where the overt act is single, continuous and composite, made up of or proved by several circumstances and passing through several stages, it is not necessary that there should be two witnesses to each circumstance."

We understand by this language that if an overt act is made up of several circumstances, it is not necessary to prove each circumstance by two witnesses. The government contends that the constitutional provision would be reduced to an absurdity by requiring two witnesses to the entire transaction. This contention, however, overlooks the fact that an overt act must be proven as alleged. If the act consists of a chain of events, it would be more absurd to think that proof of one link would be sufficient proof of the chain. Pertinent to this view is a statement in United States v. Gooding, 25 U.S. 460, 475, 12 Wheat. 460, 6 L.Ed. 693:

"The case of treason stands upon a peculiar ground; there, the overt acts must, by statute, be specially laid in the indictment, and must be proved as laid. The very act, and mode of the act, must, therefore, be laid as it is intended to be proved."

■■■ Also, the holding in United States v. Robinson, D.C., 259 F. 685, is in point. There, the court considered at length the history and requirement of the constitutional provision. The only question for decision was whether the overt acts had been proven by two witnesses. The court on page 694 of 259 F. stated: "I conclude, therefore, that it is necessary to produce two direct witnesses to the whole overt act. It may be possible to piece bits together of the overt act, but, if so, each bit must have the support of two oaths; on that I say nothing."

It may be, as suggested in the Robinson case, that where the overt act as laid consists of more than one circumstance or stage, that such act may be proven by two witnesses to each circumstance or stage. In our opinion, however, this is the minimal requirement.

■■■ It is also our judgment that the following instruction is erroneous: "If you find from the evidence beyond a reasonable doubt that the defendants or any group of them agreed among themselves to commit any one or more of the overt acts charged in the indictment in furtherance of the treason charged then the act of any one of such defendants in furtherance of the common design becomes in law the act of all and all are chargeable with it."

The criticism of this charge is that it permits the jury to find one defendant guilty of an overt act committed by another, upon the theory of a conspiracy between them to commit such act. The government, in denying the merit of this criticism, states: "There is nothing whatever in the instruction which can be construed in any way as advising the jury that it could find any defendant guilty of treason on an act committed by another defendant."

■■■ We are unable to thus appraise the language employed. As we read it, the jury were told that the act of one defendant in furtherance of a common design was the act of all and that all were chargeable therewith. We think the conclusion inescapable that the jury would understand

that one or more defendants could be convicted for the act of another. The government also argues that this instruction was proper on the theory that the defendants were acting in concert for the accomplishment of a common purpose or treasonable plot. No such situation, however, was alleged in the indictment, but, even if it had been, we are of the opinion that a defendant charged with treason cannot, under a conspiracy theory, be convicted of an overt act committed by some other person.

█ We need go no further in discussing the numerous other criticisms directed at the court's charge and its refusal to give instructions proposed by the defendants. The errors which we have discussed are not aided by considering the charge as a whole. In our opinion, they are of a character which require a reversal.

It follows from what we have said that these judgments and each of them must be reversed. They are accordingly reversed and remanded.