**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James R. HOFFA, Benjamin Dranow, Zachary A. Strate, Jr., S. George Burris, Abe I. Weinblatt, Calvin Kovens, and Samuel Hyman, Defendants-Appellants.**

**Nos. 14892–14898.**

United States Court of Appeals Seventh Circuit.

Oct. 4, 1966.

Rehearing Denied Nov. 28, 1966.

Swygert, Circuit Judge, dissented.

Maurice J. Walsh, Anna R. Lavin, Chicago, Ill., Morris A. Shenker, St. Louis, Mo., Frank Ragano, Tampa, Fla., George F. Callaghan, Richard E. Gorman, Chicago, Ill., Jacques M. Schiffer, Rockville Center, N. Y., Charles A. Bellows, George J. Cotsirilos, Prentice H. Marshall, Chicago, Ill., for appellants.

Raymond E. LaPorte, Tampa, Fla., for appellant Dranow.

Howard W. Minn, Chicago, Ill., Jason E. Bellows, Sherman C. Magidson, Chicago, Ill., of counsel, for appellant Weinblatt.

Donald Page Moore, Atty., Dept. of Justice, Fred M. Vinson, Jr., Asst. Atty. Gen., Washington, D. C., Edward V. Hanrahan, U. S. Atty., Chicago, Ill., Jerome Feit, Atty., Dept. of Justice, Washington, D. C., William O. Bittman, James Canavan, Thomas J. McTiernan, William E. Ryan, Washington, D. C., of counsel, for appellee.

Before DUFFY, Senior Circuit Judge, and CASTLE and SWYGERT, Circuit Judges.

DUFFY, Senior Circuit Judge.

The appellants herein were indicted on June 4, 1963, on twenty-eight counts. The first twenty-seven counts charged substantive violations of the mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343). The twenty-eighth count charged a conspiracy to commit the substantive offenses. The jury convicted all appellants on the conspiracy count, and each appellant on certain of the substantive counts.

The Court directed a judgment of acquittal of all defendants on Counts 2, 5, 11, 26 and 27. The Government dismissed Counts 10 and 18.

Except for the interstate transmission or mailing involved, the allegations of each of the first twenty-seven counts are, for all practical purposes, identical, alleging the same scheme to defraud the Central States, Southeast and Southwest Areas Pension Fund, often referred to in the record as the Teamsters Pension Fund or just the Pension Fund.

The indictment charged and the proof showed that defendant James R. Hoffa was president of the Teamsters Inter-

national Union,[1] president of Local 299 of the Teamsters Union in Detroit,[2] and also a trustee of the Teamsters Pension Fund.

The indictment charged that the defendants conspired and did "devise a scheme and artifice to defraud the Pension Fund * * * by means of false and fraudulent pretenses, representations and promises by submitting false and misleading statements of material fact and by concealing material facts in order to obtain loans from the Pension Fund; and diverting, through various fraudulent devices, substantial amounts of the loan proceeds for their personal use and benefit."

The indictment described the alleged scheme in some detail including the following: Defendants Dranow and Burris contacted prospective loan applicants and obtained employment as their agents for procuring Pension Fund loans. Dranow and Burris induced the prospective loan applicants to retain them by holding themselves out as being in a specially favored position to obtain Pension Fund loans because of their special relationship with defendant Hoffa. Hoffa and Kovens referred some of these prospective loan applicants to Dranow and Burris. Among the loan applicants involved were defendants Strate and Hyman.

The indictment further charged that Dranow, Burris, Strate, Hyman and Kovens participated in the preparation and submission of inflated loan applications to the Pension Fund; that these applications contained material falsifications and concealed material facts and that defendant Hoffa made misrepresentations to and concealed material facts from the trustees and staff members of the Fund.

The indictment further alleged that all of the defendants enriched themselves by causing more than $1,000,000 of the fraudulently obtained loan proceeds to be diverted to purposes other than those ap-

proved by the Pension Fund trustees. In addition, the defendants, by their participation in the scheme, allegedly obtained stock options, fees and contracts for services, construction fees, and ownership and control of borrowing corporations.

The indictment charged that in disposing of some of the diverted loan proceeds, the defendants applied more than $100,000 to the repayment of debts incurred by Sun Valley, Inc., a Florida real estate corporation, in which Hoffa had a substantial secret interest. Repayment of these debts enabled Sun Valley to extricate itself from reorganization proceedings under Chapter X of the Bankruptcy Act. Included among the Sun Valley debts that the diverted proceeds assisted in repaying was $400,000 owed by Sun Valley to a Florida bank. Repayment of this Sun Valley debt enabled Hoffa to withdraw from the Florida bank $400,000 of Teamster money which Hoffa had deposited in a non-interest-bearing account at the bank as security for the bank's $400,000 loan to Sun Valley.

Separate counts of the indictment contained allegations of the mailings, telegrams and telephone calls by which the alleged scheme was furthered. The indictment concluded by charging that all of the defendants conspired together to devise and carry out the scheme.

■ At the trial, the Government presented testimony and documentary evidence tending to prove the charges made in the indictment. As often happens, where a number of defendants are charged and convicted of participating in a conspiracy, counsel for appellants will present their arguments based largely on testimony favorable to or given by their clients, while completely ignoring other testimony of a contrary nature. They will, perhaps, give lip service to the well-established doctrine and rule that in resolving the issue of sufficiency

---

1. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. Truck Drivers Local 299, Detroit, Michigan.

of the evidence to sustain a conviction, an appellate court must view the evidence and the reasonable inferences which may be drawn therefrom in the light most favorable to the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Mims, 7 Cir., 340 F.2d 851, 852. But, after giving such lip service, the rule often is ignored. We feel that is true in the instant case.

The Government offered proof which was received in evidence as to a number of specific transactions in which various of the defendants were involved. In all of these transactions except No. 1, loans were made by the Teamsters Pension Fund. These transactions were designated as:

1. The Florida Bank-Sun Valley transactions;

2. The Connelly-Everglades transactions;

3. The Strate-Pelican-Fontainebleau transactions;

4. The Hyman-Key West Foundation transactions;

5. The First Berkeley transactions;

6. The Kovens-Sager-Good Samaritan Hospital transactions;

7. The Kipnis-Causeway Inn transactions;

8. The Simon-Airport Hotel transactions;

9. The Strecker-4306 Duncan transactions; and

10. The Dioguardi-Club 300 loan.

Within the limits of this opinion it is not practical to discuss in any detail all of the various transactions hereinbefore listed, nor the part played in each by the various defendants. Therefore, we shall not refer in detail to more than two of these transactions.

The Government offered proof which tended to show that the scheme or conspiracy commenced in 1958 when defendant Hoffa began his efforts to rescue Sun Valley, Inc. from insolvency and thus, so the Government argues, to protect himself from possible charges that he had been misusing Union funds.

Sun Valley, Inc. was a real estate promotion in Florida. It was planned that lots in the Sun Valley project would be sold to members of the Teamsters Union as well as to others. Henry Lower, a former Teamster employee, was the president of Sun Valley. Hoffa promoted Sun Valley lot sales at Teamster meetings and had an option to purchase 45% of the Sun Valley stock. Hoffa also had countersigned $75,000 worth of Sun Valley notes of which a total of $25,000 were outstanding and unpaid. He also owned a number of lots within the project.

After Henry Lower's death, an instrument bearing Hoffa's signature was found in a cookbook in Lower's desk by his son. This document disclosed that Lower held $22\frac{1}{2}$% of Sun Valley stock in secret trust for Hoffa. Although Hoffa denied that it was his signature on the document, handwriting experts at the trial testified that it was genuine.

In 1956, Sun Valley was in need of funds. The property was mortgaged. When Sun Valley applied to the Florida National Bank for loans, the bank insisted that Hoffa's local Union No. 299, at all times, maintain on deposit in the bank, a restricted non-interest-bearing account, in a sum equal to the amount of the Sun Valley borrowings. Hoffa then deposited money belonging to the Union and the bank immediately made loans to Sun Valley equalling the amount of the Union deposits.[3]

From July 1958 to July 1960, Sun Valley, being unable to meet its bills, was involved in a reorganization proceeding under Chapter X of the Bankruptcy Act. During this period, Sun Valley owed Florida National Bank $399,000 and Hoffa's Detroit Local had $400,000 tied

---

3. On June 20, 1956, Hoffa deposited $300,000 of Teamsters funds in the restricted account. The bank loaned Sun Valley $300,000 on the same day. On November 17, 1956, Hoffa deposited an additional $200,000 of Teamsters funds, and two days later the bank loaned Sun Valley an additional $200,000.

up in the "restricted" account at the bank. On three occasions during 1959, Hoffa. tried to withdraw the Detroit Local's $400,000 but the bank would not honor the checks.

Under the heading "The 'Bail-Out' Effort Begins," the Government cites negotiations with one Sanson, and offered proof to show that Sanson, a Florida business man, had a large loan application pending before the Teamsters Pension Fund trustees. In the summer of 1958, Dranow told Sanson that his loan would be put through if Sanson paid a substantial "fee" to him. Sanson agreed to do so, but told Dranow that the "fee" would be paid by check which would contain an explicit reference to the true purpose of the check. Apparently Dranow then lost interest and terminated the conversation.

In July 1958, Dranow and Hoffa jointly called Sanson on the telephone. Hoffa, in Dranow's presence, proposed that if Sanson would "straighten out" Sun Valley, Sanson's pending Pension Fund loan application would be granted. Hoffa suggested to Sanson that he (Sanson) would be able to obtain additional Pension Fund loans for the Sun Valley project. Hoffa said "that this was a must proposition for him, that it was something that had to be done. * * * "

Dranow and his financial agent, defendant Weinblatt, met with Sanson,[4] but Sanson turned down Hoffa's proposal.[5] The Pension Fund rejected Sanson's loan application.

In September 1958, defendant George Burris incorporated Union Land and Home Company for the purpose of rescuing Sun Valley. Burris was acting as a "front" for Dranow, and Hoffa knew of Dranow's concealed interest in the Company. Hoffa and Burris agreed that Union Land and Home Company would pay off a promissory note which Hoffa had cosigned for Sun Valley, and reimburse the Teamsters Detroit Local for the interest which the Local had lost as a result of having its $400,000 tied up in the "restricted account." In exchange, Hoffa agreed to give up his Sun Valley stock option. No mention was made of Hoffa's secret agreement with Lower.

## THE CONNELLY-EVERGLADES TRANSACTIONS

One Vaughan Connelly owned the Everglades Hotel in Miami. He sought a Pension Fund loan to finance renovation of the hotel by defendant Kovens, a Miami contractor. Kovens said he would bring in a man "who could secure the loan with the Teamsters * * * a little man * * * who always seemed to be able to deliver the goods." He brought in Dranow, introducing him as "Grossman." Dranow, in turn, brought in Burris and introduced him as an accountant for the Pension Fund who "handled all his Teamster loan applications."

During August and September 1958, Connelly discussed the proposed loan with Kovens, Dranow and Burris. The latter helped prepare the loan application. Dranow asked a $300,000 fee for procuring a $3,300,000 loan. Connelly agreed.

In January 1959, the Pension Fund trustees, including Hoffa, granted the loan, and Connelly received his first million dollar draw. Dranow and Kovens told Connelly the fee would have to be paid "under the table" in "small bills" and at once. Reference was made to the fact that "Hoffa was raising hell, * * *." Dranow then got excited and told Connelly he hoped the latter would not be harmed. "These boys play rough", said Kovens.

The following day, Connelly took $100,000 in small bills to Kovens and Dranow. The inference is strong that these bills were from the proceeds of the

---

4. Dranow brought Kovens and Burris to meet Sanson. He introduced Burris as a man who had "great influence" with the Teamsters.

5. Sanson wrote a report on the Sun Valley development. He recommended its abandonment and suggested that its continuance would violate the "moral obligations" owed by the promoters to the Teamster members buying lots in the project.

Pension Fund loan. Kovens burned the money wrappers. Dranow stuffed the cash into a bag and left to go "to Washington to deliver the money to the Boss." [6]

Throughout the spring of 1959, Connelly made additional "fee" payments to Kovens and Dranow. In May 1959, Dranow told Connelly "to keep out of sight" because the McClellan Committee investigators were in Miami "trying to link up Dranow and * * * pension loans with the Teamsters and with Mr. Hoffa." Kovens suggested that Connelly leave the country, but Connelly refused to do so.

However, when Committee investigators interviewed him, Connelly denied that he had made pay-offs for his Pension Fund loan. Connelly told Kovens, Burris and Dranow that he had lied to the investigators. Dranow said Connelly "had stood up for Mr. Hoffa." Later, Hoffa, referring to Connelly's denial, told Connelly that it was "a fine statement."

By late spring of 1959, Connelly was again short of funds. Dranow told him he could get him another million dollars from the Pension Fund "but it was going to cost * * * more money than the other one. * * *"

Dranow and Burris helped Connelly on his second loan application. A loan to Connelly of $1,000,000 was approved on Hoffa's motion subject to certain conditions which had not been fulfilled. At the end of a regular meeting of the Pension Fund trustees, Hoffa called what the Government has characterized as a "rump session of the Pension Fund trustees" and told them "Connelly has got to have his check today." Thereupon, Connelly got his million dollar check.

By January 1960, Connelly was once more short of money. He discussed his inability to pay his debts with Hoffa and Dranow. Connelly prepared a letter requesting a Pension Fund moratorium on all of his loan payments. Hoffa told

him to make the letter stronger and get it to the Fund prior to its March 15th meeting. Hoffa told Connelly to stay away from the meeting saying "I'll call you if I need you." At the March 15th meeting, on Hoffa's motion, the Fund trustees voted for the moratorium.

In April 1960, Connelly appearing before a federal grand jury investigating Sun Valley and Pension Fund pay-offs, denied making any pay-offs in connection with his loans. Later, he told Dranow that he had lied to the grand jury. Two months later, the Pension Fund foreclosed its mortgages on Connelly's hotel.

The evidence disclosed that Connelly had paid almost $400,000 in "fees" in connection with his loans and proof was made, which the jury was entitled to believe, that $15,000 of this money went into what the Government called "the Sun Valley bail out."

## STRATE-PELICAN-FONTAINE-BLEAU TRANSACTIONS

Defendant Strate was one of the principal owners of the Pelican Corporation which was constructing the Fontainebleau Hotel in New Orleans. Difficulties in financing were encountered as the building was being erected on leased land. The Pension Fund twice had rejected applications, Hoffa explaining "We cannot see the leased land."

In April 1959, representatives of Strate contacted Kovens who referred them to Dranow who later instructed them to provide $175,000 in "small bills and old money" in a safety deposit box.[7] This was done. Dranow promised to deliver a $1,350,000 Pension Fund loan for a "fee" of only $155,000. Strate and his partners agreed to the terms.

On June 6, 1959, Strate applied to the Pension Fund for the loan. He appeared before the Board of Trustees, being introduced by defendant Hoffa who made

6. At this time, both Dranow and Hoffa were living at the Woodner Hotel in Washington.

7. The arrangements for $175,000 in small bills to be placed in a safety deposit box originally had been made for Attorney Cohen prior to any contact between Strate and Dranow. However, Strate or his representatives went along with the small bills-safety deposit box procedure.

no mention of the "leased land" problem. In July, the Board approved the $1,350,-000 loan. Within a month, Strate delivered $155,000 "in old small bills" to Dranow. This "fee" was funded by the proceeds from the Pension Fund loan.

In October 1959, Strate applied for a $2,325,000 Pension Fund loan "to build an addition to" the Fontainebleau. During these negotiations, Strate made a number of misrepresentations to the Pension Fund Board.

Between March 1960 and November 1961, Pelican received $3,350,000 in Pension Fund construction loan proceeds but only about $3,104,000 was used on the new construction. Over $200,000 was used by Strate for stock purchases, repayment of loans and payments to himself. The Government offered evidence to support its claim that almost $50,000 can be traced through Dranow and Weinblatt into "the Sun Valley bail out."

## WAS THE EVIDENCE SUFFICIENT TO ESTABLISH THE CONSPIRACY AND THE CONNECTION OF EACH DEFENDANT WITH IT?

■ The Government had the burden to prove that the defendants conspired to and did devise a scheme to defraud the Pension Fund by submitting false and fraudulent representations and concealing material facts from the Pension Fund trustees and staff in order to obtain Pension Fund loans. It also had the burden of showing that defendants used the mail and wire services in aiding the execution of the scheme.

■ The burden also rested on the Government to demonstrate that the central object of the conspiracy was to obtain money for the purpose of "bailing out" Sun Valley, and that each defendant had knowledge of the conspiracy and scheme. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 123; Direct Sales Co. v. United States, 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674.

Each defendant strongly insists that the evidence did not establish the existence of such a scheme and further argues that even conceding the existence of such a scheme or conspiracy, the evidence did not connect him with it.

■■ Although the Government was required to establish one conspiracy rather than a series of separate conspiracies, Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, the fact that a conspiracy's various members may play different roles in executing it, and have dissimilar motives for participating in it, does not mean that a single conspiracy does not exist.

■ We hold the proof in this case was sufficient for the jury to find that a single conspiracy did exist and that each defendant was a knowing member of it; that Hoffa's primary concern when the conspiracy was formed and the central purpose of the conspiracy and scheme was to "bail out" Sun Valley. Further, that Dranow, Kovens and Burris knowingly assisted Hoffa in this effort which resulted not only in the rescue of the Sun Valley project, but also in their receipt of cash payments and other emoluments.

Strate and Hyman were borrowers whose object in joining the scheme was to get large loans for their projects. Kovens, in the Good Samaritan transactions, and Burris in the First Berkeley transactions, would also fit into the borrower category. It seems clear that the borrowers' need for large loans was so great that they were willing to pay the price of joining the conspiracy. Applicable is the statement in Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 257, 92 L.Ed. 154, that all the defendants " * * * knew of and joined in the overriding scheme" and that "All by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end * * *."

■ To find defendant Hoffa guilty, it was not necessary for the Government to prove that he knew every detail of the arrangement between Dranow, Burris, Kovens and the borrowers. It also was unnecessary for the Government to prove that the borrowers knew the details of

other loans placed through Hoffa for the evidence was sufficient to support the jury's finding that all had a stake in the common venture.

Defendant Hoffa urges that the Pension Fund did not actually lose money on the loans involved in this case. However, due to the long term nature of the loans and the fact that subsequent loans were made to refinance earlier loans, it was impossible to ascertain with certainty whether or not a loss occurred. In any event, it is well established that actual loss is not an essential element of the crime. United States v. Sylvanus, 7 Cir., 192 F.2d 96, 106.

The Fontainebleau Hotel loans illustrate the defendants' involvement in procuring otherwise doubtful Pension Fund loans for applicants who were willing to pay the price, and also demonstrate how loans were granted which, undoubtedly, would not have been made if all the actual facts had been known.

Strate and his group had twice failed to obtain loans from the Pension Fund due to the fact that their hotel was being built on leased land. However, when Dranow and Burris intervened, and Dranow was promised a fee of $155,000, the loan was approved.

A second loan of $2,235,000 was made to Strate and his group for additional construction on the Fontainebleau Hotel. The Government offered proof to show that during the negotiations for that loan, Strate made false representations to the Pension Fund trustees regarding past and future expenses and the presence of the requisite owner's equity.

The Government also proved that defendant Hoffa called the Pension Fund appraiser and informed him that although the owner's equity requirement had not yet been met for the above loan, the applicants would be able to meet it within sixty days. Seventeen days later, the Pension Fund issued its letter of commitment granting the full $2,350,000 loan.

The type of misrepresentation found in connection with the granting of the Fon-

tainebleau loan is illustrative of those made in connection with other loans in this case.

Defendant Hoffa argues that his interest in helping Sun Valley was motivated only by his desire to help the Teamsters, but the jury apparently was unimpressed by his protestations of good faith. It was entitled to believe the testimony that Hoffa considered the "bail out" of Sun Valley, a "must proposition." From the evidence submitted, it undoubtedly rejected Hoffa's proffered motive and concluded that Hoffa's interest in "bailing out" Sun Valley was generated by other considerations.

One of these considerations was Hoffa's financial interest in Sun Valley discussed above. Another and perhaps far more important one which the jury could have considered, was Hoffa's use of $400,000 of Teamster money to secure Sun Valley's financial position. The jury could have concluded that in light of the McClellan Committee investigation, Hoffa was most anxious to get this money out of the Florida bank and return it to the Union Local. This conclusion may have been further buttressed by the testimony that Hoffa had congratulated Connelly for lying to the McClellan Committee about the Pension Fund loan pay-offs.

Finally, Hoffa's claim of good faith interest in Sun Valley runs afoul of the fact that his secret connection with Sun Valley could properly be regarded as a violation of his fiduciary duties to the beneficiaries of the Teamster Pension Fund.

Dranow's connection with the scheme is clearly evident. He took an active part in the conspiracy at every step. He was active in placing all the larger loans. He succeeded in obtaining substantial amounts of money for himself and his claim that he sought only legitimate finders' fees apparently did not ring true to the jury. His insistence on his fees from Connelly and Strate being paid in "small old bills" and having Connelly falsify to the McClellan Committee as to the Ever-

glades loan, all belie his claimed innocence.

It is not necessary to discuss Dranow's attack on the substantive mail counts, as his conviction on the conspiracy count sustains the sentence imposed on him. Lawn v. United States, 355 U.S. 339, 359, 78 S.Ct. 311, 2 L.Ed.2d 321.

Defendant Burris argues he was also merely engaged in the legitimate business of obtaining finders' fees for placing loans. However, the evidence discloses that Burris was involved far beyond an interest in legitimate finders' fees. Dranow introduced Burris to Connelly as the accountant who handled all of his Teamster loan applications. The jury was entitled to believe that Burris was a co-conspirator who had an active part in obtaining fraudulent loans from the Pension Fund, using the proceeds of inflated loans to help extricate Sun Valley as well as to make a profit for himself. Burris took an active part in the Everglades loans to Connelly and the Key West loan to Hyman. Furthermore, Burris became the accountant for the Strate Fontainebleau group at the time they were applying for a second loan.

Defendant Kovens was not involved in all of the transactions proved. However, there was sufficient evidence for the jury to conclude that he was a knowing member of the conspiracy and scheme to defraud the Pension Fund.

As early as July 1958, Kovens brought up the possibility of Connelly taking over Sun Valley. He later introduced Connelly to Dranow whom he called "Grossman," as an individual who could secure Pension Fund loans. It was also Kovens who suggested to Connelly that he leave the country until the McClellan Committee investigators left town.

In addition, the Government offered proof of misrepresentations made by Kovens to the Pension Fund trustees in connection with the Good Samaritan Hospital loans, and showed that it was Kovens who brought Dranow into the Strate Fontainebleau Hotel transactions.

We find that the evidence would have warranted the jury in concluding that Kovens was involved in the conspiracy and scheme in numerous other respects.

Undoubtedly, defendant Hyman was principally interested in obtaining loans for his various business projects. However, we find that from the evidence, the jury could have concluded that Hyman was a member of the conspiracy, finding that he knew the price of obtaining a Pension Fund loan through Dranow and Burris was a finders' fee that would help Dranow and others to extricate Sun Valley.

Hyman admitted investing $100,000 in Union Land and Home Company, the company formed for the purpose of "bailing out" Sun Valley. He also advanced $50,000 to pay creditors of Sun Valley in May 1960. Evidence was offered to show that he was repaid for this advance out of the proceeds of a $400,000 Pension Fund loan. The application for this loan was made in the same month that Hyman made his advance to pay Sun Valley creditors.

The timing of the advance and the loan application is curiously coincidental. When the fact is added that Hoffa supported the loan with false statements, the inference readily appears that the granting of the loan was not on its merits, but as the result of a conspiratorial agreement.

The role of defendant Strate has been discussed above in connection with the Fontainebleau loans. The fact that he and his group had been unable to secure a Pension Fund loan until Kovens brought Dranow into the picture and agreed to pay the latter a finder's fee of $155,000 is significant. The loan went through on Hoffa's motion and Dranow notified the Strate group that the loan had been approved before it received formal notification. Considering all this, the jury could well have concluded that the loan was not made on the merits but as a result of the conspiracy.

Weinblatt was a lesser member of the conspiracy. He was Dranow's agent and his nominee of a number of bank ac-

counts. He acted as such because Dranow wanted his own interest in these accounts concealed from investigators. The District Judge imposed a sentence of one hour in custody and a fine of $5,000. Although Weinblatt was not of great importance in the scheme, the jury did have a basis for holding that he was knowingly implicated in the conspiracy.

## QUESTION OF SEVERANCE

■ A number of defendants claim error because their motion for a severance was denied. However, as they were all part of one conspiracy, it was proper to try them together. Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154; Schaffer v. United States, 362 U.S. 511, 514, 80 S.Ct. 945, 4 L.Ed.2d 921.

Hoffa and Kovens complain that it was prejudicial for them to have been tried with Dranow because the personality of the latter would naturally antagonize a jury. We do not think that this complaint amounts to error in view of the extremely close association of Hoffa and Kovens with Dranow in various loan transactions.

## DENIAL OF SPEEDY TRIAL

■ Hoffa and other of the defendants claim they were denied their constitutional right to a speedy trial. There was a delay due to the Hoffa trial in Tennessee. The instant case went to trial on April 27, 1964, about six weeks after Hoffa's conviction in Tennessee, and some eleven months after the return of the indictment. The Tennessee indictment had been returned prior to the indictment in the instant case. Under the circumstances, we hold that there was no abuse of discretion on the part of the trial judge in postponing the trial, and we hold that defendants were not denied their constitutional right to a speedy trial.

## ALLEGED ERRORS AT THE TRIAL

■ The trial of the instant case extended over a period of three months. At least six of the attorneys for the various defendants were actively engaged in the defense. It would have been quite unusual if some errors had not occurred during that extended period. However, as the Supreme Court has stated, the test is that "A defendant is entitled to a fair trial but not a perfect one." Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593.

We shall now consider and discuss a number of the alleged errors which the defendants claim to be prejudicial and which, they argue, require a reversal and a remand for a new trial.

## ALLEGED ERROR IN THE SELECTION OF GRAND AND PETIT JURORS

Defendants Burris, Hoffa and Kovens claim that the manner in which the grand and petit jurors were selected constituted prejudicial error. They claim that these jurors were improperly drawn because the Jury Commissioner did not participate in the drawings [8] and because the names were not read aloud as they were drawn from the box.

■ The challenge to the grand jury array has been waived by laches. Defendants were arraigned on June 25, 1963. They indicated a willingness to forego all pretrial motions if they were granted an immediate trial. The trial judge explained that a trial date was not possible until the coming fall, and granted them twenty days to file any motions. Many motions were filed seeking discovery, bill of particulars, severance, and attacking the indictment in whole or in part. The case was called for hearing on March 23, 1964. On April 9, 1964, a motion was filed challenging the petit jury array. It was not until April 13, 1964, that a motion was filed challenging the grand jury array. This was an un-

---

8. 28 U.S.C. Section 1864 requires participation by the Commissioner in the placing of names in the jury box, but there is no provision as to the person who must draw the names from the box.

reasonable delay. Hyde v. United States, 225 U.S. 347, 373, 32 S.Ct. 793, 56 L.Ed. 1114. It was filed after the time permitted by Rule 12(b), F.R.Cr.P.

 28 U.S.C. § 1864, provides that the names of the jurors "shall be publicly drawn from a box containing the names of not less than three hundred qualified persons at the time of each drawing." Pursuant to the practice in the District Court, the clerk of court assisted by two deputies, drew the jury panel. Defendants requested that the names drawn for the petit jury be read aloud. The trial judge held that such a procedure would not be necessary in order for the drawing to be a public one under § 1864. To insure that the potential jurors would not be approached by either the Government or defendants prior to the selection of the jury, the Judge ordered that until the voir dire, their names were not to be disclosed to counsel on either side, the marshal or the court itself. The list was locked in the clerk's vault. 28 U.S.C. § 1864 requires that the jury be publicly drawn, but it does not require nor do we interpret it to mean that the names must be read aloud. No efforts were made to keep secret the fact that a jury was being drawn. The trial judge was, undoubtedly, extremely sensitive to the idea of possible jury tampering, and was taking extra precautions so that the prospective jurors would remain free from any contamination. We hold prejudicial error was not committed in following the procedure here outlined.

## DEFENDANTS CLAIM ERROR DUE TO EMPANELLING PROCEDURES

Certain of the defendants claim prejudice because the court limited the defendants to eighteen peremptory challenges; also, because they were not permitted to ask certain questions of the potential jurors, and because the trial judge at first limited their time with each venireman, and later took over the questioning himself.

 The selection of the jury in this case consumed ten court days. Over 500 veniremen were questioned on the voir dire before the twelve jurors and four alternates were chosen. The Federal Rules of Criminal Procedure entitle non-capital defendants, whether tried singly or jointly, to no more than ten peremptory challenges as a matter of right. There is no constitutional or statutory right to a greater number. Stilson v. United States, 250 U.S. 583, 586–587, 40 S.Ct. 28, 63 L.Ed. 1154; Schaefer v. United States, 251 U.S. 466, 470, 40 S.Ct. 259, 64 L.Ed. 360.

Defendants also complain that they were not permitted to inquire into certain subjects such as the political affiliations of the prospective jurors, or whether a venireman had ever crossed a Teamsters picket line.

 We hold that under the circumstances present, and considering the length of time consumed in the process of selecting jurors, the trial court acted within its discretion in foreclosing inquiries which seemed to be of a dilatory nature.

 As to the judge taking over the examination of potential jurors, a defendant in a criminal case does not have a right to have his counsel question each venireman on the voir dire. Paschen v. United States, 7 Cir., 70 F.2d 491, 495. Furthermore, Rule 24(a), F.R.Cr.P., permits the trial judge, in his discretion, to conduct the examination himself. This rule has been held to not violate any constitutional right of a defendant. Hamer v. United States, 9 Cir., 259 F.2d 274. We find no error with respect to the manner in which the jury was selected.

## PREJUDICIAL PUBLICITY

All defendants claim they were prejudiced by publicity directed toward the defendant Hoffa, charging much of this publicity was generated by the Government. Particular complaint is made of the public clashes between the then Attorney General, Robert F. Kennedy, and the defendant Hoffa.

Defendants argue that the trial court failed to take adequate action to protect

them from various kinds of prejudicial publicity. They assert that during the period of the jurors' selection, Look Magazine published a story concerning an alleged plot by Hoffa to assassinate Robert F. Kennedy, and that shortly thereafter, Life Magazine ran a similar article.

Selection of jurors commenced on April 27, 1964, and continued to May 11. On May 1, Attorney General Kennedy spoke at a Law Day observance at the University of Chicago. During a question and answer session with students after the speech, Kennedy admitted he had heard the charges made by one Edward G. Partin that Hoffa was interested in the suggested assassination of him. Although the Attorney General's answer was not given in an interview with the press, a news story based on the statement did appear in the newspapers.

Whenever any person of prominence is charged with a crime, the story usually will receive wide distribution through various news media. It may be impracticable to postpone the trial for a period long enough for public interest to die down. As the Ninth Circuit Court of Appeals said of Dave Beck (Beck v. United States, 298 F.2d 622, 628)— " * * * it seems obvious that it would be impossible ever to bring this defendant to trial if it were necessary to await a complete abatement of all publicity concerning a man so much in public view."

 The fact that a juror may have read newspaper accounts or heard comments on radio or television relative to a criminal charge is alone not sufficient ground for excusing a prospective juror. Finnegan v. United States, 8 Cir., 204 F. 2d 105, 110. It is not required that jurors be totally ignorant of the facts and issues involved. Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed. 2d 751. In the latter case, the Supreme Court said at page 723, 81 S.Ct. at page 1642—"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would

be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

The voir dire examination is the proper place to determine whether a defendant's public notoriety has resulted in a prospective juror's prejudice. Although counsel for defendants complain that they were unduly restricted on the voir dire, we do not think this is true. Some ten court days were consumed in obtaining the jurors who sat on this case. As each panel of veniremen entered the box, the trial judge informed them that only those who could put aside any past opinions and reach a decision entirely on the evidence presented in court were desired as jurors. Each venireman was asked if he could do so, and those who expressed any doubt as to their ability in this regard, were excused.

 A reading of the transcript of the proceedings extending over a two weeks' period is convincing that the jurors selected were not prejudiced by publicity as to Hoffa or otherwise.

## JURY SEQUESTERED AT GREAT LAKES NAVAL STATION

The sequestered jury was taken from a downtown Chicago hotel and removed to the Bachelor Officers' quarters at Great Lakes Naval Station. All of the defendants claim such action was error, and the defendant Hoffa suggests that the jury was kept " * * * under virtual military imprisonment [which] was violative of the Fifth [due process] and Sixth [public trial] amendments." Hoffa further argues that such a sequestration " * * * is patently at odds with the basic American tradition deploring any interference by the military with the regular administration of justice in the civil courts."

 We hold that in view of the notoriety given to the trial, sequestration of the jury was entirely proper. Furthermore, the trial judge knew of recent charges of alleged jury tampering

and naturally thought it advisable to keep the jury isolated.

The quarters at the Great Lakes Naval Station were separate and comfortable. They were within one hour's drive from the federal courthouse. The jury could more easily be kept isolated at these quarters than in a crowded downtown hotel where jury contact with hotel employees such as bellboys and elevator operators would necessarily be frequent.

 The place where the jury was to be kept was within the sound discretion of the trial judge. We hold that there was no abuse of that discretion and that there was no error committed by reason of quartering the jury during the trial at the Great Lakes Naval Station.

## JUROR LEE WAS EXCUSED

Near the close of final arguments, the trial judge received information from the attending doctor that the ninety-two year old mother of Juror Lee had undergone major surgery for a broken hip, and that he did not expect her to leave the hospital alive. The Judge asked the parties whether they wished to continue with eleven jurors in the event of the lady's death during deliberations, or whether they would prefer to have the first alternate juror replace Lee before the deliberations began.

Counsel for defendants suggested that Lee be consulted as to whether he wished to be excused, but if the Court refused to do so, they would prefer proceeding with the alternate juror substitution. The trial judge did not desire to consult with Juror Lee and did not do so. He excused Lee, and the trial proceeded with the first alternate juror sitting as a member of the panel.

 We hold the trial judge did not err in excusing Juror Lee without having consulted him as to whether he wished to be excused.

## SUBMISSION OF COPY OF IN-DICTMENT TO JURY

During the deliberations of the jury, its foreman handed the Deputy Marshal in charge a sealed document which was delivered to the Court. The document requested information, but was ambiguous as to what specific information the jury desired. It referred to "work papers" and mentioned "document of all counts," "document of law on all counts" and "document of overt acts named." Several rows of numbers were also listed, apparently indicating the twenty-one counts then remaining in issue and the seven counts which had been dismissed.

As seven of the twenty-eight counts had been dismissed, the jury may well have been in doubt as to which were the seven counts no longer in the case. However, upon reading the jurors' request, the trial judge told the Deputy Marshal to give a copy of the entire indictment to the jury and to tell them "they can have this [the indictment] and nothing more." None of the defendants or their attorneys were then present. The Deputy Marshal gave the indictment to the jury and related the Court's oral message.

It was later discovered that the copy of the indictment which had been sent in to the jury, contained certain ink markings. The Court indicated that it had not placed these markings on the copy of the indictment at the time it was sent to the jury room.

The principal marking on the indictment was the word "out" written immediately after the subheads of count 5, count 10, count 11, count 18, count 26 and count 27. All of these counts either had been stricken by the Court or dismissed by the Government.

The only other marks on the copy of the indictment were lines drawn through the name of Herbert R. Burris who had been dismissed from the case, and two small markings near Hoffa's name in a sentence relating to a telephone call between Hoffa and one Maurice A. Lieberman. It would appear that the markings on the copy of the indictment were made by some member or members of the jury, and were in no way prejudicial to Hoffa or the other defendants.

It is urged, however, that the trial court committed reversible error in communicating orally with the jury and in sending in the copy of the indictment in the absence of defendants and their attorneys. Defendants insist that the trial judge stated he would notify the parties and their counsel if any questions were asked by the jury during deliberations.

Undoubtedly, the trial judge assumed that it would assist the jurors to have the indictment before them so as to enable them to relate the counts of the indictment to the various transactions. The trial judge knew this would be a problem and earlier had suggested a form of verdict which would have identified the counts, such as putting "Everglades" at the top of Count 2. However, defendants objected and this was not done. The Court asked for suggestions as to how the counts could be better identified for the jurors, but counsel for defendants had none.

In United States v. Press, et al., 2 Cir., 336 F.2d 1003, a somewhat similar situation was discussed at page 1016. The Court said: "It is not improper for the court to read the indictment in its entirety or portions thereof to the jury (citations). Indeed, in protracted cases involving numerous counts such as this one, reference to the indictment often serves as a helpful guide in delineating the issues the jury may be called on to decide. Similarly, it is not error to give the indictment to the jury for use during its deliberations (Citing cases). The decision to do so rests in the sound discretion of the court."

The defendants claim that the copy of the indictment transmitted new information to the jury, since in reading the indictment to the jury, the court had omitted certain portions. However, the Court repeatedly had advised the jury that the charges in the indictment were not evidence of guilt. To illustrate, the Court told the jury "As you have heretofore been advised, the indictment which has been returned by a grand jury is not any evidence of guilt and must not be construed by you as such." Again, the

Court pointed out in reading a portion of the indictment—"That these are mere allegations in the indictment which are not proof of anything." At another point the Court said to the jury—"Now, again, I tell you that the indictment in this case is no evidence of the defendants' guilt * * *. You must not be prejudiced against the defendants because an indictment has been returned against them."

We note that counsel for defendant Hoffa had earlier indicated he wanted the jury to know that a number of counts had been dismissed and that other portions of the indictment had not been proved. He said the jury was entitled to know that the Government "flunked 25% of the course; that is seven counts out of twenty-eight went down * * *."

It was not good practice for the trial judge to have sent the brief message and indictment to the jury in the absence of defendants and their counsel, but it is obvious that the indictment was the only thing the Court sent to the jury whether or not anything was said. No further instructions were given as was the situation in the majority of cases relied on by defendants. See United States v. Neal, 3 Cir., 320 F.2d 533; Evans v. United States, 6 Cir., 284 F.2d 393, 94 A.L.R.2d 266, and Rice v. United States, 8 Cir., 356 F.2d 709, 717. Under the circumstances then present, we hold that the procedure now complained of was not prejudicial and does not warrant a reversal of defendants' convictions. United States v. Compagna, 2 Cir., 146 F.2d 524; Walker v. United States, 116 U.S.App.D.C. 221, 322 F.2d 434.

### EVIDENCE OF HOFFA'S PRIOR CONVICTION

On May 9, 1963, Hoffa was indicted in the United States District Court for the Middle District of Tennessee on a charge that he had willfully endeavored to influence, intimidate and impede petit jurors in the discharge of their duties in violation of Title 18 U.S.C. § 1503. The indictment in the Tennessee case was returned prior to the time that the indict-

ment was filed in the instant case. The jury in the Tennessee case found Hoffa guilty of the charge, and the United States Court of Appeals for the Sixth Circuit affirmed. United States v. Hoffa, 6 Cir., 349 F.2d 20.[9]

In the instant case, defendant Hoffa took the stand in his own behalf. At the beginning of the cross examination, Hoffa admitted he had been convicted in March 1964 of endeavoring to obstruct justice by tampering with the federal district court jury, his verbatim answer being "Yes, by perjured testimony of an admitted kidnapper." Hoffa now claims the Court committed prejudicial error in permitting the Government to impeach him by adducing testimony of his conviction which was then pending on appeal.

The trial court relied on our decision in United States v. Empire Packing Company, 7 Cir., 174 F.2d 16, 20, cert. den. 377 U.S. 959, 69 S.Ct. 1534, 93 L.Ed. 1758. The panel or division of our Court in that case consisted of Judges Major, Minton and Wham. On this appeal, the Government likewise relies on Empire Packing and states that Bloch v. United States, 9 Cir., 226 F.2d 185, 188, is in accord.

Hoffa relies on our decision in United States v. Levi, 7 Cir., 177 F.2d 827 [Major, Minton and Duffy]—apparently considering that our decisions in Empire Packing and Levi are inconsistent. We do not agree.

In Empire Packing we said: " * * * An accused, taking the stand in his own defense, may be cross-examined regarding a prior conviction for a felony, as affecting his credibility (citing cases). The fact that Chapman's conviction for income tax evasion was pending on appeal, as brought out in the trial court, did not render the cross-examination improper. Unless and until the judgment of the trial court is reversed, the defendant stands convicted and may properly be questioned regarding said conviction solely for the purpose of testing credibility. (Citing cases) * * *."

In Levi, the Assistant United States Attorney asked Levi if he were the same Levi who was convicted a few days previously in a tax evasion case. We held this question was error because Government counsel knew or should have known that a judgment of conviction had not been entered in that case, and that the trial court still had the motion for acquittal under consideration. Judge Minton wrote a dissenting opinion expressing the view that there was no reversible error. The circumstances that surrounded the impeaching question in Levi are certainly distinguishable from those of the case at bar.

We cannot say that the trial court committed reversible error in following the law in this circuit. No authorities have been cited to us to convince us now that our previous decision in Empire Packing was erroneous.

An additional reason for finding no prejudicial error in the impeaching question is that Hoffa's experienced and able counsel did not object to the question when it was asked. In fact, in his closing argument to the jury, counsel said: "But the first thing that Mr. Bittman [Government Counsel] went to for Mr. Hoffa like, a grip, and *it is proper cross examination—I didn't object—*'Are you the James R. Hoffa who was convicted in Chattanooga?'" [Emphasis supplied] Counsel for Hoffa then told the jury that the Tennessee conviction was on appeal, and that the Government's use of it for impeachment purposes indicated a lack of confidence in both the Tennessee conviction and in the instant prosecution.

Several of defendants' trial counsel including counsel for Hoffa had previously conferred with the trial judge requesting advice as to his ruling should any former convictions of the defendants be brought out on cross examination. The trial judge informed them that he would permit the Government to bring

---

9. The Supreme Court later granted certiorari limited to one question. Hoffa v. United States, 382 U.S. 1024, 86 S.Ct. 645, 15 L.Ed.2d 538.

out the prior convictions on the authority of *Empire Packing*. It is, therefore, quite apparent from this and counsel's above comments to the jury that counsel for Hoffa deliberately decided not to enter an objection to the impeaching question. We hold that it was not reversible error to ask witness Hoffa if he had previously been convicted.

### TESTIMONY OF ALTERNATE JUROR PARE

Defendants filed an additional and supplemental motion for a new trial based upon information coming to them through alternate juror Pare. At a hearing held after the jury had returned its verdict and had been dismissed, Pare testified that during the trial, a member of the jury had shown him a Chicago newspaper article concerning the trial court's exclusion of the Link-Dranow letters discussed *infra*. Pare testified he had read the article but that no conversation had occurred in connection with it.

It appears that while the jury was at Great Lakes Naval Station, newspapers were available to them. However, any articles referring to the trial of the instant case were cut out before the jurors received the papers. We surmise that the article in question was missed because of its inconspicuous placement between the obituary column and the church announcements.

There was no evidence of any outside influence on the jury and from Pare's testimony, it appears that, for the most part, the jurors followed the Court's admonition not to discuss the case among themselves until the case was finally submitted to them for decision. We think, under all of the circumstances present, that these matters brought to the attention of the trial judge after verdict were not sufficient to require an inquest by the Court or the granting of a new trial. We find no error in the Court's refusal to call back the jury for examination or in its denial of a new trial.

### ALLEGED ERRORS AS TO RECEIPT AND EXCLUSION OF EVIDENCE

The defendants urge numerous claims of error based upon the admission or exclusion of evidence. Perhaps the alleged error most strenuously urged by defendants relates to the Link-Dranow letters.

On cross examination, defendant Dranow was asked if he had written a letter to George Burris stating "Everything can be blamed on me, and everything that could be put on me to protect the others should be blamed on me. * * *" Dranow answered he did not recall writing the letter although it was in his handwriting.

Dranow was then asked if he had written a second letter designating certain persons including some of the defendants, who should put aside sums of money ranging from $5 to $15 per day, to be eventually turned over to him. Upon objections, the Court instructed the jury to consider this matter only as to Dranow. The witness again answered he could not recall writing the letter, nor did he recall delivering either of the letters to Mr. Irving Link, but admitted that the second letter was also in his handwriting.

Both initially and at the end of the testimony, the Court instructed the jury to consider this evidence only as to defendant Dranow. However, later the Court decided that the possible prejudice to the other defendants outweighed the testimony's relevance and it instructed the jury to disregard the testimony of both Dranow and Link as to these letters, and not to take this testimony into consideration in arriving at its verdict.

We hold there was no error as the letters were admissible to impeach Dranow. The trial judge exercised wise discretion in refusing to grant a mistrial, and he protected the rights of the other defendants by directing the jury to entirely disregard the letters.

■ The other claimed errors relating to the admission or exclusion of evidence, including evidence as to benefits payable by the Pension Fund, have been considered, and we hold there was no prejudicial error.

Other contentions by some or all of the defendants as to production of corporate documents, that the trial judge was guilty of misconduct, as to Government counsel's comments in arguing to the jury, and that certain instructions were erroneous, all have been carefully considered. We find no error therein. Each claim of error by counsel for defendants has been carefully considered and all such claims of error are hereby denied.

The judgments of conviction in each of the appeals, Nos. 14892, 14893, 14894, 14895, 14896, 14897 and 14898 are

Affirmed.

SWYGERT, Circuit Judge (dissenting).

My dissent is based upon several grounds. First, a number of trial errors independently require a reversal of the convictions of all defendants. Additionally, a reversal without remand is required as to certain defendants because the Government's proof sustained neither a single scheme to defraud the Teamsters' Pension Fund as charged in the indictment, nor a single, overall conspiracy to violate the mail fraud statute as alleged.

My apology for the length of this dissent rests largely on the fact that the evidence as to many of the loan transactions must be discussed briefly.[1] Only then does it become apparent that there was a fatal variance between the charges and the proof and that much irrelevant, prejudicial evidence was submitted to the jury. Moreover, in order to demonstrate that prejudicial trial errors occurred, certain relevant background facts must be stated. Several trial errors will be discussed first.

## I.

### 1. The Impeachment of Hoffa by the Tennessee Conviction

In my opinion the district court committed reversible error in permitting the Government to impeach the defendant Hoffa by his conviction of jury tampering in a federal district court in Chattanooga, Tennessee.[2] The impeaching evidence should not have been permitted to be used because of the Government's ordering of the Chattanooga and Chicago indictments to create an atmosphere of prejudice against all defendants through an otherwise unrelated, factually subsequent conviction of one of them.

The indictment against the defendants in the instant case was returned on June 4, 1963,[3] less than one month after Hoffa was indicted for jury tampering in Tennessee. The facts giving rise to the Tennessee charge, however, occurred sometime after those which prompted the prosecution of the present case. At the arraignment in this case in June 1963 all defendants announced that they were ready for trial and offered to waive all pretrial motions in order to obtain a speedy trial. The Government resisted all such efforts, however, stating that it wanted to try the Tennessee case first because it involved "one of the defendants" named in the indictment. The district judge acceded to the Government's position. The Tennessee case began in January 1964, and Hoffa was convicted of jury tampering on March 4, 1964. Following Hoffa's Tennessee conviction, all defendants moved for a continuance of the instant trial, which had been set for

---

1. The facts were multifarious and complex. The trial lasted three months. The record consists of approximately 17,000 pages of testimony and trial proceedings.

2. United States v. Hoffa, 349 F.2d 20 (6th Cir. 1965), cert. granted, 382 U.S. 1024, 86 S.Ct. 645, 15 L.Ed.2d 538 (1966).

3. On the same day, in the federal district court for the Southern District of Florida, the Government moved to dismiss an indictment returned in October 1961 which charged Hoffa with mail fraud and conspiracy in connection with the promotion of the Sun Valley enterprise among Teamsters locals and their members.

April 27, because of the fear of prejudicial publicity and the use of Hoffa's conviction for impeachment purposes pending its appeal. These motions were also denied and the trial proceeded as scheduled.

In this manner the Government was permitted to arrange the trial date in this case so that the Tennessee case could be tried first and thereby be used for impeachment purposes even though only a single defendant was involved therein and even though that conviction was for an offense occurring subsequent to the alleged offenses being tried in the instant prosecution. In these circumstances this court should adopt the view expressed by the Pennsylvania Supreme Court in Commonwealth v. McIntyre, 417 Pa. 415, 208 A.2d 257 (1965). In treating a similar situation, that court stated:

> Generally, the scheduling of criminal trials is a matter within the discretion of the Commonwealth. We are unwilling to allow opportunity for arranging the trial of cases so that a criminal record might be created where that record would not otherwise exist were the earlier offenses tried promptly.

> What we here decide is that on the particular record facts and circumstances of this case the introduction of the defendant's criminal record of crimes committed subsequent to the charge being tried was unduly prejudicial and unfair. This requires that the conviction be set aside and that a new trial be had. Especially is this so because, in this instance, the prejudice created by the introduction of the subsequent criminal record far outweighed the Commonwealth's need in the trial of the case, as an evidentiary circumstance, to impeach defendant's credibility by use of these particular records.

> If for some compelling reason the local trial calendar or the orderly administration of criminal justice is better served by trying a subsequent offense first, then a criminal record so created should not be admissible against a defendant in his later trial. * * * 208 A.2d at 261.

Furthermore, there was no waiver by Hoffa's counsel of an objection to the impeaching testimony. The question of its admissibility was raised both at a pretrial hearing and during the trial in advance of Hoffa's testimony, when the district judge was asked whether he would permit the disclosure of the Tennessee conviction. The record permits no doubt that its admissibility was challenged on both occasions. The Government objected to a ruling in advance of Hoffa's taking the stand.[4] The judge, however, ruled that he would allow the impeaching question to be asked and answered even though the Tennessee conviction was pending on appeal. Given this ruling, it is understandable from the standpoint of defense trial strategy that no formal objection to the impeaching question was raised when it was put to the witness before the jury and that Hoffa's counsel argued as he did in reference to the Tennessee conviction in his summation. Once an objection is unqualifiedly interposed, there is no requirement that it be renewed at the risk of waiver.

2. The Letters Used to Impeach Dranow

The defendant Benjamin Dranow testified in his own behalf. At the time of the trial he was under sentence in a federal prison for convictions of mail fraud, income tax evasion, and bail-jumping. His competency had been challenged during the voir dire examination after the district judge disclosed that he had received a long, rambling, and rather incomprehensible telegram from Dranow. During the trial Dranow made frequent outbursts and had many verbal clashes with the judge, the attorneys, the mar-

---

4. If the Government had been successful in this endeavor, the tactic would have permitted the question to be asked even though the court might not have permitted it to be answered.

shals, and even spectators. As a witness he was vulgar and boisterous.[5] Repeated defense motions for a mistrial or a severance from Dranow were denied.

During Dranow's cross-examination, the prosecutor inquired:

Mr. Dranow, did you ever write a letter to S. George Burris in which you told him, "Everything can be blamed on me, and everything that could be put on to me to protect others should be blamed on me. But don't let that affect your feelings toward me in any way whatsoever."

Defense counsel objected. The judge overruled the objection with the statement that if the question were answered, it must be "followed up." The prosecutor assured the court that this would be done. After further objection that the communication inquired about was "after the alleged offense," the court instructed the jury to consider the matter only as to Dranow for the purpose of impeachment. Motions for a mistrial and a hearing outside the presence of the jury were denied. Dranow, after being shown the letter, which was undated, admitted it was in his handwriting, but said he did not know when he sent it or to whom it was written.[6]

Dranow was then asked:

Did you write a letter, Mr. Dranow, saying: "I want the following amounts put away for me from each of the following persons each day. I want all this money put in one spot where it will be picked up four or five times a year and enable me to pay for the new place and business: a. The California buildings, $10 per day; b. George Burris, Irving ask George, $10 per day; c. Sam Hyman, George, ask Sam $10 per day; d. Cal Kovens, George ask Cal, $10 per day; e. Glen Hillborn Fashion Mart Building, George ask Glen, $5 per day; f. Lou Gladstone, Milton talk to Lou, $15 per day." Did you write that, sir?

Objections to this question and motions for severance were again overruled, and the judge again limited the evidence to Dranow. Dranow replied that the letter was in his handwriting, but that he didn't recall the details of when he had written it or whether it had been delivered to Irving Link.

Irving Link, who had testified during the Government's case-in-chief, was later recalled as a rebuttal witness. Link testified that Dranow told him in September 1962 that there would be mail addressed to a friend of Dranow's, Buck Traub, which was meant for Link. Link said that a letter, thus addressed, later proved to contain the two letters about which Dranow was questioned.

Subsequently, the judge refused to admit the letters into evidence. He referred to the prejudicial nature of the letters, noted that an "inference" could be drawn that they referred to Dranow's other prosecutions, and also commented that "weighing the dangers against the benefits, I am going to protect this record." Later the judge instructed the jury to disregard the testimony of both Dranow and Link in regard to the letters.[7]

---

5. As a rather mild illustration, when Dranow was asked on cross-examination whether he had any connection with the Teamsters' Pension Fund, he replied, "Yes, I'm their representative in the prison. If the prison wants a loan, I will recommend it."

6. The salutation on the letter read "Dear George."

7. The cautionary instruction given reads as follows:

Among the last witnesses you hear in the last testimony you heard was some testimony about a witness by the name of Link, and the cross-examination of Mr. Dranow.

In the course of interrogation of Mr. Dranow and the interrogation of Mr. Link, some reference was made to some letters.

The court instructs you to disregard the testimony of both Mr. Dranow and Mr. Link in regard to those letters, and do not take that into consideration in any way in arriving at your verdict.

If the communications just discussed were relevant at all, a conclusion subject to considerable doubt, they were admissible only to impeach Dranow.[8] Indeed the trial judge so recognized, at all times attempting to limit consideration of the letters by the jury to that defendant. The majority opinion assumes without discussion that the admissibility of these communications against Dranow, attended by cautionary instructions to the jury, effectively disposes of the other defendants' objections. The possible relevance of the documents to the impeachment of Dranow, however, is not determinative of the most important question raised. The crucial question is whether the disclosure of the contents of the letters was so prejudicial to the other defendants that the prejudice could not be cured by the final exclusion of the letters from the evidence, that is, whether the other defendants were entitled to a severance from Dranow because of the prejudice so injected by the prosecutor.

There is only one answer to this question. The letters were inherently prejudicial to all defendants. Together they conveyed a strong inference of guilt of all; as to those named in the second letter, the inference was inescapable that they were guilty of some misconduct for which they could be blackmailed for an indefinite period of time. Asking a jury to compartmentalize or disregard such evidence was an impossible task.[9] There can be little doubt that the prosecutor's efforts to impeach Dranow in this manner were in fact attempts to inject highly inflammatory material into the case prejudicial to all the defendants. The

courts have consistently held that the harm thus created cannot be undone by instructions from the trial court. United States v. Clarke, 343 F.2d 90 (3d Cir. 1965); Scott v. United States, 263 F.2d 398 (5th Cir. 1959); Holt v. United States, 94 F.2d 90 (10th Cir. 1937).

In this circuit, in United States v. Haupt, 136 F.2d 661 (7th Cir. 1943), statements tending to incriminate not only the defendants who made them but also other defendants were admitted only against the defendants who made them, under instructions from the court. We held there that such efforts to limit the evidence to the individual declarants were ineffectual and that the trial court erred in denying the various defendants' motions for a severance. We stated:

> A reading of these statements, however, leaves no room for doubt but that they were damaging not only as to the defendants against whom offered but as to all others. We doubt if it was within the realm of possibility for this jury to limit its consideration of the damaging effect of such statements merely to the defendant against whom they were admitted. We have equal doubt that any jury, or for that matter any court, could perform such a herculean feat. * * *

> We are unaware of any procedure which the trial court could have devised, other than a severance, by which these incriminating statements could have been introduced against the defendants making them, without seriously prejudicing the rights of other defendants. Id. at 672.

---

8. The Government argues in this appeal that the letters were admissible against Dranow because they were received by Link during the existence of the conspiracy and, alternatively, that they were admissible against all defendants as "verbal acts * * * relevant to prove the existence of a conspiracy." Aside from the fact that this belated argument appears designed to avoid meeting head-on the defendants' principal contention relating to the inherent prejudice of the letters, the argument is without merit. First, Sun

Valley was completely rehabilitated and Local 299 had recovered its funds when the letters were received. Second, the letters could not qualify as "verbal acts" inasmuch as they were not written in explanation of an independently material act.

9. That the letters may have had a deep impact on the jurors is evidenced by the fact that the juror who eventually became the foreman showed alternate juror Pare a newspaper account of the events surrounding the efforts to introduce the letters into evidence.

The defendants' motions for severance from Dranow should have been granted.

### 3. Communication with the Jury in the Absence of the Defendants

Another trial error concerns a communication by the judge with the jury in the absence of the defendants and their counsel, after the jury had retired to deliberate upon its verdicts.

During the discussion over requested instructions between the district judge and counsel, the judge indicated that he proposed to read the indictment to the jury, but that he did not intend to send a copy of it to the jury room. The defendants did not object to a reading of the indictment, but suggested that certain portions upon which evidence had not been offered be omitted. The judge nevertheless indicated that he intended to read the entire indictment. During his charge, however, he did not read the entire indictment; he omitted certain of the portions to which the defendants had voiced objection and also omitted the allegations contained in seven counts, advising the jury that these counts had been dismissed.

After the jury returned its verdicts, defense counsel inquired whether the jury had a copy of the indictment in its possession during its deliberations. The judge informed them that the jury had in fact been given a copy. It was later disclosed through the testimony of the deputy marshal in charge of the jury that he had received a sealed communication from the jury during the course of its deliberations which he delivered to the judge. On one of the two pages in this note, the following appeared:

1 Document of all counts

2 " of law on all counts

3 " of overt acts named

Please return

The second page contained the signature of each member of the jury. It was also disclosed that upon receiving this communication, the judge directed the deputy marshal to deliver the indictment to the jurors and to tell them that "they could have this and nothing more." Neither Government or defense counsel nor the defendants were notified of this request from the jury, nor were they informed of the judge's action in response to it, despite the fact that the judge had expressly stated that such notice would be given.[10]

The action of the district judge in sending the indictment to the jury room without notifying counsel and in communicating with the jury through the deputy marshal out of the presence of the defendants and their counsel was a violation of the defendants' rights under the sixth amendment, as well as a violation of Rule 43 of the Federal Rules of Criminal Procedure. The decisions in which conduct similar to that condoned by the majority has been condemned are legion. E. g., Shields v. United States, 273 U.S. 583, 47 S.Ct. 478, 71 L.Ed. 787 (1927); Rice v. United States, 356 F.2d 709 (8th Cir. 1966); United States v. Neal, 320 F.2d 533 (3d Cir. 1963); Jones v. United States, 113 U.S.App.D.C. 352, 308 F.2d 307 (1962); Evans v. United States, 284 F.2d 393 (6th Cir. 1960); Little v. United States, 73 F.2d 861 (10th Cir. 1934).

A defendant's right to be present at all stages of a criminal trial includes the right to be present on those occasions when the judge communicates with the jury during its deliberations on any important matter. "Private communications, even though harmless in themselves, may open the way to abuses and may destroy confidence in legal procedure and the judiciary. Therefore, it is improper for the judge to hold any impor-

---

**10.** The record discloses the following statement by the judge after his charge to the jury:

> I request that all parties involved * * * leave with the Marshal your phone numbers at which you can be readily reached in case there is a verdict or in case there is some inquiry made by the jury, so that within an hour's time of the time a question is asked or a verdict is arrived at, we can all assemble here.
> Have your clients available if they desire to be here for the verdict or whatever question may be asked.

tant communication with the jury concerning the case unless openly and with opportunity to the accused to be present and to object and to take exceptions." Ray v. United States, 114 F.2d 508 (8th Cir.), cert. denied, 311 U.S. 709, 61 S.Ct. 318, 85 L.Ed. 461 (1940).

The majority opinion dwells upon the assistance which the jury may have derived from the indictment in identifying the substantive charges against each defendant, and adverts to the unquestioned rule that a jury may be entitled to have the indictment during its deliberations, citing United States v. Press, 336 F.2d 1003 (2d Cir. 1964), cert. denied, 379 U.S. 965, 85 S.Ct. 658, 13 L.Ed.2d 559 (1965). These observations are irrelevant. The point which the majority fails to emphasize is that the indictment was transmitted to the jury in response to a request which was ambiguous at best, and was accompanied by an oral communication through the marshal that no more information would be furnished—without notice to the defendants and their counsel and without an opportunity to be present to offer comments or objections. This was plain error.

Although the majority does not recognize the judge's action as error, it does acknowledge that it was "not good practice" for the judge "to have sent the brief message and the indictment" to the jury in the absence of the defendants and their counsel. The majority then concludes that the defendants were not prejudiced thereby. The fault with this conclusion is twofold. First, it is doubtful that a showing of prejudice was required, since the error committed was of constitutional proportions. Shields v. United States, supra; Arrington v. Robertson, 114 F.2d 821 (3d Cir. 1940). In any event, in all the decisions involving communications between court and jury in the absence of defendants, prejudice is strongly presumed and the burden is upon

the Government to produce evidence showing that no prejudice resulted. Rice v. United States, supra; Little v. United States, supra. In Walker v. United States, 116 U.S.App.D.C. 221, 322 F.2d 434, 436 (1963), cited by the majority, the court said that "we cannot let [the defendant's] conviction stand 'unless the record completely negatives any reasonable possibility of prejudice' to him arising from the judge's error." Second, here a "reasonable possibility" of prejudice to the defendants affirmatively appears in the record. For example, a portion of the indictment not read to the jury during the court's charge appears as follows:

> The action of the defendant, James R. Hoffa, in depositing funds of * * * Local 299 in the * * * [bank at] * * * Orlando, Florida, was being questioned by the court-appointed Board of Monitors for the International Brotherhood of Teamsters * * * in a judicial proceeding in the United States District Court for the District of Columbia * * * as a breach of his fiduciary duties.

Even Government counsel recognized that the jury should not be informed of this and other allegations in the indictment upon which no evidence was offered.[11] Yet, the indictment sent to the jury was unexpurged. More importantly, the jury's note was subject to interpretation as requesting something other than, or in addition to, the indictment. The communication itself indicated that the jury may have been confused and uncertain. In these circumstances, this court should not speculate that no prejudice to the defendants resulted when further inquiry on the part of the jury was *immediately foreclosed* by the judge through an oral communication by the marshal in the absence of the defendants and their counsel.

11. During the conference on instructions, the prosecutor, in reply to the judge's inquiry whether the Government had excluded any reference to the counts which had been dismissed from its proposed jury instructions, stated:

> Yes, I did, your Honor. I thought we ought to in fairness to the defendants. I also left out the material with reference to the monitor's proceedings which was excluded by your Honor—

## II.

The indictment in this case was hinged upon the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, which generally proscribe the use of various communications media in the furtherance of schemes to defraud or to obtain money by fraudulent representations. Each of twenty-seven substantive counts contained identical allegations charging the devising and execution of a single, all-inclusive scheme to defraud the Teamsters' Pension Fund, differing only in the particular interstate transmission alleged to be in furtherance of the scheme. The final count charged a single conspiracy among all the defendants to use the communications media in the execution of the overall scheme which they were alleged to have jointly devised.

The indictment contained allegations of certain background facts preliminary to outlining the alleged scheme. As the central part of this background, it was alleged that in 1955 Hoffa obtained a secret financial interest in Sun Valley, Inc., a Florida corporation engaged in the sale of real estate, and that he also placed $400,000 belonging to the Detroit Teamster Local 299 in the Florida National Bank at Orlando as collateral to secure a loan granted by the bank in that amount to Sun Valley; that Sun Valley thereafter met with financial difficulties and was unable to repay the loan and that the bank therefore refused to release the funds held as security. It was alleged that Dranow formed Union Land and Home Company, Inc. in September 1958 to acquire and succeed Sun Valley, which was then under the process of reorganization under the bankruptcy laws; that Burris, Dranow, and Weinblatt, at Hoffa's direction and for his benefit, undertook to acquire Sun Valley, to pay its debts and the reorganization costs, and thereby to secure the release of Local 299's funds from the bank.

The scheme to defraud the Teamsters' Pension Fund was alleged to have been devised sometime prior to July 2, 1958 by all the defendants. It was allegedly designed to defraud the Fund by the obtainment of loans through false representations. The various roles which each of the defendants was alleged to have played in the fraudulent securement of these loans can be stated in general terms. Dranow, Burris, Kovens, and Weinblatt were alleged to have cooperated in seeking out loan applicants and assisting them in preparing materially false applications to the Fund. Strate and Hyman were alleged to have been among those who submitted such applications. Hoffa was alleged to have used his position as a trustee of the Pension Fund to further misrepresent the facts and thereby influence approval of the loans. The indictment alleged that by virtue of this scheme the defendants diverted more than one million dollars from the proceeds of loans from the Pension Fund to themselves in the form of fees, contracts for services, and control of borrowing corporations, and that more than one hundred thousand dollars of the funds so diverted was used to rehabilitate Sun Valley.

The loans which were alleged to have been included in the scheme devised by the defendants were listed in the indictment. These loans, totalling more than twenty million dollars, included loans:

1) To remodel the New Everglades Hotel, Miami, Florida;

2) To refinance and enlarge the Fontainebleau Motor Hotel, New Orleans, Louisiana;

3) To finance construction of a shopping center, renovation of apartment buildings, acquisition of real property, and payment of mortgages by the Key West Foundation Company, Key West, Florida;

4) To finance the purchase by Casa Marina Hotel Corporation of the Casa Marina Hotel, Key West, Florida;

5) To finance the purchase by LaConcha Hotel Corporation of the LaConcha Hotel, Key West, Florida;

6) To obtain permanent financing for Four-Three-O-Six Duncan Corporation, Saint Louis, Missouri;

7) To finance the purchase by First Berkeley Corporation of buildings known as Connell Buildings and Cornell Buildings, and a leasehold interest in the Beverly Wilshire Health Club, located in the vicinity of Los Angeles, California;

8) To pay off obligations and make improvements to the Cornell Buildings operated by First Berkeley Corporation in Los Angeles, California;

9) To refinance mortgages on the Miracle Plaza Shopping Center, Vero Beach, Florida;

10) To construct North Miami General Hospital, North Miami, Florida;

11) To provide financing for the Miami International Airport Hotel, Miami, Florida;

12) To provide financing for the Birmingham Airport Motel, Birmingham, Alabama;

13) To construct and improve the Causeway Inn, Tampa, Florida;

14) To refinance mortgages and other obligations of Club 300, Upper Saddle River, New Jersey.

From this brief outline of the charges against the defendants, a number of observations become pertinent. In an indictment such as the present one, for all practical purposes there is no difference between the substantive charge of devising and executing a scheme to defraud and the charge of conspiring to commit the substantive offense, that is, unlawfully agreeing to devise and execute the scheme. "A scheme to use the mails to defraud, which is joined in by more than one person, is a conspiracy." Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946); Cochran v. United States, 41 F.2d 193, 199 (8th Cir. 1930). The Government's theory of the indictment and the evidence demonstrates this fact. The scheme to defraud was attempted to be shown as an unlawful joint enterprise by the defendants, that is, a conspiracy. Thus, but for the fact that the law permits separate substantive mail and wire fraud counts to be based upon individual communications, the scheme and the conspiracy merged insofar as the evidence related to the proof of them.

Another characteristic of the indictment is its preoccupation with the financial well-being of Sun Valley. In the Government's efforts to charge and prove a single scheme or conspiracy among all the defendants, Sun Valley became the unifying element. The majority opinion explicitly recognizes that, at least under the Government's theory of the case, the extrication of Sun Valley from its financial difficulties, for Hoffa's benefit, was the common object of the alleged scheme to defraud the Pension Fund. Such a cohesive force among the defendants was necessary to avoid the objection that multiple schemes or conspiracies encompassing fewer than all of the defendants were involved. The existence of multiple conspiracies would have necessitated separate trials to avoid a fatal variance in the proof similar to that occurring in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The difficulty in placing Sun Valley in a position of prominence as the central physical objective of the alleged scheme is nevertheless visible in the indictment. The defendants were alleged to have diverted over one million dollars to themselves, yet only one hundred thousand dollars was alleged to have "trickled down" to Sun Valley, a relatively insignificant amount which could have been supplied from any one of several "finders fees" paid by various recipients of loans from the Pension Fund. As the defendant Kovens suggests, had the charge been merely that the defendants devised a scheme to enrich themselves at the expense of the Pension Fund, the task of binding them together would have been manifestly more difficult. It is also significant to note that the last recorded activity in discharging the Sun Valley indebtedness occurred in June 1960 and that the $400,000 belonging to Teamsters Local

299 was released by the Florida National Bank at Orlando on June 27, 1960.

If the Sun Valley situation was in fact the tying element in this case, then its position calls for an obvious, but seemingly overlooked, clarification. The defendants were not on trial for effecting the reorganization of Sun Valley. The rehabilitation of Sun Valley, or, to use the Government's epithet, the Sun Valley "bail out," was not illegal per se. The fact that Hoffa may have had a "secret" interest in Sun Valley or that his actions with respect to it may have been in violation of some duty owed by him to the members of Teamsters' Local 299 had nothing whatever to do with the crime charged in the indictment. The only legitimate reason for the inclusion of the Sun Valley and Union Land and Home Company operations in the indictment and the submission of evidence in respect to them was to show how these operations may have furnished a motive for, or been the object of, a scheme to obtain loans from the Pension Fund through false and fraudulent representations. Therefore, the Government's repeated inferences, both during the trial and in this appeal, that Sun Valley could only be associated with skullduggery and other varieties of evil-doing are largely beside the point. If rescuing Sun Valley was an "end," then for the purposes of this case it could have been no more than the lawful object of a conspiracy to achieve a lawful end by unlawful means.

A similar observation should be made with respect to the aura of criminality cast about the payment of fees ("pay offs") and other "diversions" from loan proceeds as such.[12] The payment of a fee to one who assists in the procurement of a loan, whatever else it may be, is not of itself a fraud upon the lender. Nor are "diversions" fraudu-

lent standing alone, as the trial court recognized in its instructions to the jury, if not in the reception of evidence.

The gist of the crime charged in this case resides in the allegations and evidence submitted in respect to false and fraudulent representations made to the Pension Fund by the defendants. Unless this essential element of the crime was proved, the alleged diversions of money to Sun Valley, although necessary to bind the defendants together, were meaningless. Thus it was incumbent upon the Government to prove that loans were obtained from the Pension Fund through material misrepresentations by the defendants, and also to prove that the defendants had joined together to do precisely this sort of thing for some reason common to all of them. This common object, the Government says, was Sun Valley.

With these premises in mind, an analysis of the evidence reveals a fatal variance from the crimes charged in the indictment, prejudicial to the defendants Strate, Hyman, and Kovens, and a great mass of evidence which was wholly irrelevant to the crimes there charged, prejudicial to all the defendants.

### 4. Variance in the Proof

The evidence, viewed in the light most favorable to the Government, does not disclose a single scheme to defraud the Pension Fund through misrepresentations in order to rescue Sun Valley from financial ruin. Instead, the résumé of the evidence which follows tends to show several smaller and distinct schemes, involving different combinations of the defendants and with two or three defendants common to all the schemes, each designed to effect the personal enrichment of the particular members of the scheme. Yet all the evidence relating to all of the loan transactions al-

---

12. As an example of the climate which was created in connection with Sun Valley and the payment of fees, the Government asserts that knowing participation in the conspiracy is shown by the awareness on the part of certain defendants that the "price" of getting Pension Fund loans was to make money available to rehabilitate Sun Valley. While such conduct may be morally reprehensible, it does not amount to a fraud upon the Pension Fund, the crime charged in the indictment, absent some misrepresentation to the Fund.

leged in the indictment was admitted against all the defendants.

### (a) *The Everglades Hotel Loans*

Two loans were made by the Pension Fund to Vaughn B. Connelly [13] to finance the renovation of the Everglades Hotel, Miami, Florida. The first loan, $3,300,000, was obtained in January 1959. Kovens was the building contractor. He brought Dranow and Burris into the loan negotiations. Burris helped to prepare the application. Later, Hoffa joined the discussion relating to this application. The evidence shows that Connelly made payments to Dranow totalling $300,000 in connection with this loan, under suspicious circumstances which the majority opinion has pointed out. The evidence also shows that Connelly paid $15,000 to Hyman Greenberg, Dranow's brother-in-law, which found its way into Union Land and Home Company to assist in the rehabilitation of Sun Valley. This money, however, was not shown to have come from the Pension Fund loan. Further, no misrepresentations to the Pension Fund in connection with this loan were proved and the indictment did not include a substantive charge based upon any mailings relating to it. Strate and Hyman nowhere appear in connection with this loan.

The second Everglades loan, for $1,000,000, was secured by Connelly in July 1959. Burris and Dranow assisted in the preparation of the loan application and Hoffa was influential in obtaining its approval. No direct misrepresentations appear to have been made in this application, but the evidence does show that at the time the loan was paid out, an inspection, an appraisal, and the execution of a mortgage as a part of the

security for the loan had not taken place, and Connelly had not yet paid a required $5,000 "service charge" to the Fund. Assuming that these latter items amounted to material misrepresentations to the Pension Fund, the evidence failed to connect Strate and Hyman with the second Everglades loan, and Kovens can only be connected by inference from his association as the contractor on the hotel. Nor was there any showing that any money from this loan was diverted to Sun Valley.[14]

### (b) *The Pelican-Fontainebleau Loans*

The Government introduced evidence of four loans made by the Pension Fund to the Pelican State Hotel Corporation, partly owned by the defendant Strate, to refinance and enlarge the Fontainebleau Hotel in New Orleans. These were the only loans with which Strate had any connection. The dates and amounts of these loans are as follows:

| | | |
|---|---|---|
| 1. | July 1959 | $1,350,000 |
| 2. | February 1960 | 2,325,000 |
| 3. | December 1960 | 500,000 |
| 4. | March 1961 | 500,000 |

The evidence shows that Dranow and Burris assisted Strate with his applications for these loans and that Hoffa was aware of their efforts and was again instrumental in securing the approval of some of the loans. The evidence also shows the payment of substantial fees and the granting of other concessions by Strate to Dranow and Burris in connection with at least the first two loans. It further shows several misrepresentations made to the Pension Fund with respect to the applications for the second and third loans.[15] Finally, the evidence reveals that Strate

---

13. Connelly, the principal Government witness, was not named as a coconspirator, although his position appears to differ from that of defendants Strate and Hyman only in degree.

14. The mailing alleged in the first count of the indictment related to this loan. All the defendants were found guilty on this count, the only loan transaction as to which defendants who did not directly par-

ticipate were accorded joint substantive responsibility.

15. Strate was convicted on the substantive counts alleging mailings relating to the first three loans. Hoffa was found guilty on the count relating to the second loan. The remaining defendants were acquitted on all the counts pertaining to the Fontainebleau loans.

diverted substantial portions of the loan proceeds to his own benefit and that he "came up with" $50,000 for the Sun Valley enterprise. The third and fourth loans, however, were granted after the rehabilitation of Sun Valley had taken place. Further, the evidence failed to disclose that either Hyman or Kovens had any connection with, or knowledge of, the Fontainebleau loans. The majority opinion states that "representatives of Strate contacted Kovens who referred them to Dranow," as an indication of complicity on the part of Kovens. The evidence shows only that an attorney friend of Strate's, Cohen, and a Miami restaurant owner, Elliott, contacted Kovens and unsuccessfully attempted to interest him in financing the Fontainebleau. Later Kovens introduced Elliott to Dranow. Dranow thereafter contacted Strate in New Orleans.

### (c) *The Key West Foundation Loans*

The Pension Fund granted two loans to the Key West Foundation Company, which owned apartment buildings in Key West, Florida. The defendant Hyman and his wife held fifty per cent of the stock in Key West. The first loan, in the amount of $875,000, was obtained in July 1959 through the combined efforts of Hyman and Burris. The evidence indicates that Hyman "invested" $100,000 of the proceeds of this loan in the Union Land and Home Company (Sun Valley) at the suggestion of Burris. No misrepresentations to the Pension Fund were proved as to this loan and the district court dismissed the count in the indictment which recited a mailing relating to it.[16]

A second loan of $400,000 was granted to Key West in June 1960 to remodel the Poinciana Apartments. The evidence supports the charge that both Hyman and Hoffa made certain misrepresentations to the Pension Fund in regard to the loan application. Hyman's false

statements were flagrant, relating principally to periodic proofs of expenditures which were required to be submitted to the Fund before disbursements could be made on the loans. Hoffa's misstatements were of a relatively minor nature and occurred while he was arguing in favor of the loan to the trustees of the Fund. They conveyed a false impression that business conditions in Key West were on the upgrade. The proceeds of the second Key West loan were not disbursed by the Pension Fund until the rehabilitation of Sun Valley was an accomplished fact; therefore, no such diversion was proved. Further, neither Kovens nor Strate was shown to have even known about the loans to Key West.[17]

### (d) *The LaConcha and Casa Marina Hotel Loans*

Late in 1961 Hyman applied to the Pension Fund for loans totalling $650,000 to finance the purchase of the La Concha and Casa Marina Hotels, Key West, Florida. The loans were approved in January 1962 on Hoffa's motion. As a condition for the disbursement of $217,000 of the loan proceeds, the Pension Fund required that satisfactory leases of the hotels to a responsible person be executed. Hyman leased the hotels to Charles Lavin, an operator of retirement hotels who had been working for him at a salary of $100 per week for several months, apparently assisting in the establishment of a retirement plan at the hotels. The balance of the loan proceeds were disbursed in March 1962, but Hyman fired Lavin and the hotels were never operated under the leases.

No diversions from loan proceeds were shown and the loans were disbursed long after Sun Valley had been rehabilitated. The other defendants were not connected to the LaConcha-Casa Marina

---

16. The indictment charged that the Hymans misrepresented that they were the sole owners of Key West stock when in fact they owned only 50%. The trial court held this to be an immaterial misrepresentation following the testimony of a Pension Fund official to the same effect.

17. Hyman was found guilty on four counts relating to the second loan. All other defendants were acquitted on these counts.

transactions, except that Burris was present with Hyman when the appraiser for the Fund inspected the properties.[18]

### (e) *The First Berkeley Loans*

The Pension Fund made three loans to the First Berkeley Corporation, a real estate corporation in which Burris was the sole stockholder of record.

A loan of $266,000 was granted in January 1960 to acquire the Beverly-Wilshire Health Club near Los Angeles. The Government conceded at the trial that no misrepresentations were made in connection with this loan. The second loan to First Berkeley, for $2,966,-000, was granted in March 1960 to acquire the Cornell Buildings in Los Angeles. Burris made several misrepresentations in the loan application concerning First Berkeley's collateral and financial condition which might have been material considerations in the granting of the second loan, although certain of the misstatements cited by the Government are of questionable significance. The evidence is perhaps sufficient to connect Hoffa and Dranow with this loan by their knowledge of Burris' activities.[19] The evidence, however, failed to establish that any of the loan proceeds went into the Sun Valley rescue operation.

A third loan of $300,000 was granted by the Pension Fund to First Berkeley in April 1961 for improvements in the Cornell Buildings. No misrepresentations concerning this loan were proved. The loan itself was disbursed after Sun Valley had been financially restored. The Government attempted, however, to show some connection between a portion of the loan proceeds and Sun Valley by introducing evidence of a series of complicated transactions involving an earlier loan of $125,000 by John Factor to

Irving Link and Murray Randolph. The Government sought to trace the proceeds of this loan through First Berkeley to Dranow and thence to Sun Valley. Finally, it attempted to show that $55,-000 from the third First Berkeley loan was indirectly used to repay the Factor loan. The district court ruled that the Government failed to do so, and dismissed the two counts alleging mailings relating to this loan. The court, however, did not strike the evidence.

Neither Hyman, Strate, nor Kovens was connected with any of the loans to First Berkeley.[20]

### (f) *The Good Samaritan Loans*

The Government introduced evidence concerning two loans by the Pension Fund to Good Samaritan Hospital, Inc. to finance the construction of the North Miami General Hospital. Burt Sager, a Miami attorney, was the original promoter of the hospital and the organizer of Good Samaritan Hospital, Inc. Sager contacted Kovens in the summer of 1959 and inquired into the possibility of constructing a hospital on property held by Ruedd, Inc., a corporation owned by Kovens. Following several discussions, Sager decided to apply for a loan from the Pension Fund and was introduced to Burris. Burris assisted Sager's accountant in preparing an application for a loan of $2,300,000. A loan in this amount was first approved by the Fund in September 1959, but no disbursements of loan proceeds were made until late in 1960.

The indictment alleged several misrepresentations with respect to this loan, not in connection with the application itself, but generally relating to conditions placed upon the disbursement of loan proceeds by the Pension Fund. The evidence as to the materiality of these misrepresentations is equivocal at

---

18. Hyman was convicted on two counts relating to the loans. All other defendants were acquitted on these counts.

19. Hoffa was convicted on the substantive count alleging a mailing in connection

with the second loan. All other defendants were acquitted on this count.

20. Kovens did permit Burris to pledge his stock in Ruedd, Inc. as collateral in obtaining the second loan.

best.[21] But assuming the materiality of one or more of them by Kovens (concerning his bond as the contractor on the project) and by Hoffa (relating to funds which were to have been made available by investors in the hospital), none of the proceeds of the loan were shown to have been diverted for any purpose, including Sun Valley.[22] Kovens got a fee of $200,000 for constructing the hospital, but the reasonableness of his contracting fee was not called into question. The evidence also supports the inference that Kovens contributed $28,000 to assist in the reorganization of Sun Valley. His contribution, however, was not connected to the Pension Fund in any way; in fact, the payment was made before the proceeds of the first Good Samaritan loan were disbursed.

The Pension Fund granted a second loan of $500,000 to Good Samaritan in June 1961 to finance an increase in the size of the hospital. A single immaterial misrepresentation relating to this loan was proved. Eight days after the second loan was approved, during a discussion of an unrelated loan application submitted by Kovens, Hoffa told the Fund trustees that the second loan had been expended in adding another floor to the hospital, when in fact no additional floor had been constructed. The Sun Valley indebtedness had been extinguished before the loan was granted.

Finally, neither Strate nor Hyman had any connection with either of the Good Samaritan loans.[23]

*(g) The 4306 Duncan Corporation Loan*

Fred Strecker, a Pension Fund trustee, sought a Pension Fund loan to refinance property in St. Louis which he had purchased and which he held as the 4306 Duncan Corporation. Hoffa referred Strecker to Burris, who agreed to assist in securing the loan if Strecker would retain Burris' accounting firm for his business. Burris then took Strecker to Miami where they discussed the loan application with Dranow.

Later Burris contacted Max Federbush, an acquaintance, suggested that Federbush purchase the 4306 Duncan property, and told him he could obtain a loan from the Pension Fund to finance the purchase. Federbush had few resources of his own, but agreed to the proposition and signed without reading a number of papers put before him by Burris. Included in these documents was an application for a Pension Fund loan to 4306 Duncan Corporation, listing Federbush as its president. Burris then brought Strecker and Federbush together and obtained a loan of $15,000 for Federbush to give Strecker as a "down payment" on the property. Some time later, but before the Pension Fund considered the 4306 Duncan application, Burris told Federbush that his loan application had been rejected because of Federbush's prior criminal record and arranged for the return of "his" money. (Weinblatt deposited $15,000 in Federbush's bank account.)

Strecker attended the Pension Fund meeting at which the loan application was considered. Before the meeting began, Dranow and Burris told him that the application was being presented in the name of a "straw party," Federbush. Strecker testified that, within the hearing of several of the trustees, he told Hoffa that he objected to the loan application being presented in this

---

21. For example, Hoffa was shown to have represented to the Fund that Dade County, Florida was going to lease and operate the hospital and was investing as much money in it as the Pension Fund. The representations were false. They were made, however, not in connection with the application for the loan, but during a discussion concerning the reduction in the interest rate on the loan from 6½% to 6¼%.

22. The Government expressly conceded its failure to prove an allegation in the indictment that "a substantial portion of this money had been diverted for other purposes."

23. Burris, Dranow, Kovens, and Hoffa were found guilty of certain of the counts relating to the Good Samaritan loans. The other defendants were acquitted on these counts.

manner, and that Hoffa replied, "Do you want the loan or not?" The loan was approved on Hoffa's motion and 4306 Duncan Corporation subsequently received $840,000. Despite the procurement of this loan from the Fund through the connivance of Dranow, Burris, and Hoffa, no diversions or fee payments were proved and Sun Valley was nowhere mentioned or considered. Kovens, Strate, and Hyman were not connected with this transaction in any way.[24]

The preceding analysis relating to several of the loan transactions charged to be part of a single conspiracy demonstrates that no common design bound all of the defendants together. This case is therefore governed by Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In *Kotteakos*, thirty-two persons[25] were charged with a single conspiracy to violate the National Housing Act by inducing financial institutions to grant loans which would then be offered to the Federal Housing Administration for insurance upon applications containing fraudulent information. The evidence, however, proved at least eight different conspiracies to obtain fraudulent loans by separate groups of defendants which had no connection with each other except that the principal defendant acted as a broker to handle the fraudulent applications in all of them. The Supreme Court held that it was reversible error to try all the defendants "*en masse* for the conglomeration of distinct and separate offenses committed by others." Id. at 775, 66 S.Ct. at 1253. The Court stated:

> The trial court was of the view that one conspiracy was made out by showing that each defendant was linked to Brown in one or more transactions, and that it was possible on the evidence for the jury to conclude that all were in a common adventure because of this fact and the similarity of pur-

pose presented in the various applications for loans.

> This view, specifically embodied throughout the instructions, obviously confuses the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character.

> \* \* \* \* \* \*

> When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass. Wholly different is it with those who join together with only a few, though many others may be doing the same and though some of them may line up with more than one group.

> Criminal they may be, but is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Id. at 768–769, 773, 66 S.Ct. at 1249–1252.

Thus in *Kotteakos*, as here, the vice lay in the fact that the prosecution was allowed to proceed on the theory that a generic description of the substantive crime which the defendants were alleged to have conspired to commit was a sufficient common objective so as to make each defendant a codefendant with the others named in the indictment.

Hoffa, Dranow, and Burris were common actors in the majority of those loans in which evidence of fraudulent representations was present. Therefore, as to them, the joinder of multiple subsidiary conspiracies could not have been prejudicial. Kotteakos v. United States, supra. But the participation of Strate and Hyman in only those loans in which they were interested as borrowers and the participation of Kovens in only those loans in which he stood to acquire contracts for services clearly indicate that they were seriously prejudiced by their

24. The indictment did not contain a substantive mail fraud count relating to this loan, but three overt acts pertaining to it were included in the conspiracy count.

25. Nineteen persons were tried. The cases of thirteen were submitted to the jury. Seven were convicted.

joinder with each other and with the other defendants for a "conglomeration of distinct and separate offenses."

The evidence as to the defendant Weinblatt was wholly insufficient to find him criminally responsible with respect to any of the loan transactions.

### 5. Irrelevant and Prejudicial Evidence

It is apparent from the foregoing discussion that a great amount of irrelevant, immaterial evidence was admitted against the defendants. Similar evidence was introduced relating to a number of loans which have not yet been examined. In fact, a substantial number of the loan transactions as to which evidence was offered and received had no logical tendency to prove either the existence or the execution of the scheme to defraud the Pension Fund charged in the indictment, or for that matter, any scheme to defraud the Pension Fund. Loans as to which no evidence of fraud was produced and which had no relation to Sun Valley were irrelevant for any purpose. Evidence with respect to these loans had a prejudicial effect against the defendants not only because of its volume and complexity, but also because it emphasized the mere association of the defendants with each other and with the Pension Fund; moreover, it tended to emphasize the payment of fees and the obtaining of advantages by various defendants even though the Pension Fund was in no way defrauded or harmed. Loans evidencing no fraud but having some relationship with Sun Valley were prejudicial for the same reasons, and even more so, because they amounted to an invitation to the jury to find a conspiracy inherent in the mere association of persons pursuing a lawful venture.

### (a) The Miracle Plaza Loan

In June 1960 a Pension Fund loan for $1,100,000 was granted to refinance mortgages on the Miracle Plaza shopping center, Vero Beach, Florida. One of the counts in the indictment alleged the mailing of a letter by a Miami attorney representing the borrower in connection with the loan. It was shown that Kovens was associated in the venture. The mailing was proved, but the Government dismissed the count prior to the submission of the case to the jury. The evidence, however, was not stricken. No facts were introduced suggesting any fraud in connection with the loan or showing that the transaction was in any way linked to Sun Valley.

The Government argues in its brief that "the Miracle Plaza loans were tied to the scheme because Dranow, in promoting the first Berkeley and Fontainebleau deals, repeatedly pointed out this Kovens shopping center, which had been built with Pension Fund money, as one of his Pension Fund triumphs. On the third of these occasions, Strate and Burris were present when Dranow showed off the shopping center." It is difficult to comprehend how this observation, if correct, would "tie" Miracle Plaza to the scheme charged in the indictment and justify the submission of evidence in respect to it. But the observation is not even supported by the record, which indicates that the shopping center referred to by Dranow was located in Miami Beach, and not in Vero Beach, Florida, where Miracle Plaza was located.

### (b) The Miami International Airport Hotel and the Birmingham Airport Motel Loans

The indictment alleged and evidence was introduced concerning two Pension Fund loans to corporations in which George M. Simon, a Miami accountant, was interested. In 1959 a $2,000,000 loan was granted to Airway Hotel, Inc. to finance the construction of the Miami International Airport Hotel. In 1961 an additional loan of $1,000,000 was granted to finance the Birmingham Airport Motel, Birmingham, Alabama. Simon obtained the loans with Burris' assistance. Burris charged two per cent brokerage fees, totalling $85,000, for his efforts. No misrepresentations with respect to these loans were proved, nor was Sun Valley ever mentioned in connection with them.

Again referring to the Government's brief, the Government argues, "The

'airport hotel' loans were relevant, not only because they also revealed the usual arrangement of Burris procuring Pension Fund loans for a fee, but also because the loans were obtained for accountant George Simon who, at about the same time (March 1960), participated in the preparation of the fraudulent loan application filed by First Berkeley with the Pension Fund." (Simon prepared a balance sheet for First Berkeley Corporation from information furnished by Burris.) That Burris charged a two per cent fee, or that Simon had dealings with Burris was totally irrelevant.[26] These circumstances did not in any way tend to prove an unlawful agreement to rehabilitate Sun Valley by defrauding the Pension Fund.

### (c) *The Club 300 Loan*

A loan of $900,000 was made by the Pension Fund in 1961 to Club 300, Inc., Upper Saddle River, New Jersey, to finance a motel and bowling alley. The loan was the subject of one of the mail fraud counts in the indictment and three of the overt acts in the conspiracy count. Although the mailing was proved, the Government dismissed the substantive count before the case was submitted to the jury; however, the evidence was not stricken. James Dioguardi, a contractor, first talked to Hoffa about a loan on undeveloped land in New Jersey. Hoffa suggested that Dioguardi contact Burris. Later, Dioguardi consulted Burris regarding a loan for the Club 300. Dioguardi and the defendant Burris' son Herbert,[27] split a five per cent fee from the borrower for preparing the application. There was no evidence of any misrepresentations to the Pension Fund in connection with the loan and all discussions about fees occurred long after Sun Valley had been rehabilitated.

As to the relevance of this loan, the Government states, "The Dioguardi-Club

300 transaction was further evidence of the general pattern of the conspiracy to place fraudulent Pension Fund loans, since it showed that, when Dioguardi told Hoffa in 1961 that he wanted a loan, Hoffa referred him to Burris." Such a "referral" does not justify the admission into evidence of all the facts concerning the application for, and the granting of, an otherwise unassailable loan. Nor was it evidence of a "pattern" of placing "fraudulent" loans.

### (d) *The Causeway Inn Loans*

Pension Fund loans of $1,500,000 and $350,000 were granted to Causeway Enterprises, Inc. to construct the Causeway Inn, Tampa, Florida. The first loan was approved in October 1960 and the second a few months later. The district court directed a verdict of acquittal on the count in the indictment relating to these loans, but the evidence was not stricken.

Irving Kipnis promoted the Causeway Inn venture.[28] His first application for a Pension Fund loan was rejected. Later, he met Burris, who agreed to help secure the loan for a fee. While the application was pending, Burris told Kipnis that he needed some money for Sun Valley immediately and asked him to buy a ten per cent interest in it. Kipnis gave Burris a check for $57,000, allegedly for an "option-loan" interest in Sun Valley, the principal condition being that the money be refunded if the option was not exercised within three years. The check was given to Dranow, who used it to rehabilitate Sun Valley. Burris later received checks from the borrower for $57,000 and $58,000 as fees for his part in securing the loans. In turn, Burris gave Kipnis a check for $57,000 in cancellation of the "option-loan" agreement.

Evidence was introduced to show that Kovens became the contractor on the

---

**28.** Simon was neither indicted nor named as a coconspirator.

**27.** Herbert Burris, named as a defendant in the indictment, was acquitted at the close of the Government's case-in-chief.

Dioguardi was neither indicted nor named as a coconspirator.

**28.** Kipnis was neither indicted nor named as a coconspirator.

Causeway Inn, but it showed only that Kipnis' son and son-in-law made the contracting arrangements with Kovens after the first loan was granted.

The Government also introduced evidence of a third loan to Causeway Inn, Inc. In January 1963 Kipnis appeared before the Pension Fund and requested a $1,000,000 loan to be used for the expansion of the Causeway operation through the purchase of an adjacent motel. He also requested that payments on the other loans be suspended for eighteen months because the Causeway Inn was losing money. Upon Hoffa's motion, these requests were granted by the trustees.

Thus, despite the fact that the first Causeway Inn transaction was shown to have had some relationship with the attempt to rescue Sun Valley, no evidence of fraud with respect to any of the Causeway loans was produced. The Government says that the loans were relevant because they were "tied to Sun Valley," because "Kovens got the Causeway construction contract,' and because "Dranow and Burris got fees."

The Government's argument illustrates the fundamental error in the admission of much of the irrelevant evidence introduced in this case. The argument assumes that any connection on the part of any of the defendants with each other or with the Pension Fund, however innocent or remote from Sun Valley, was admissible against all the defendants to prove the scheme and conspiracy charged in the indictment. The flaw in such an assumption resides in the notion that a conspiracy is a group of people rather than an act of agreement upon a common objective. United States v. Borelli, 336 F.2d 376, 384 (2d Cir. 1964). The court in *Borelli* noted with misgiving the tendency to treat conspiracy cases in this manner. Such a practice creates problems of the kind to to which Mr. Justice Jackson referred in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (concurring opinion), when he stated:

When the trial starts, the accused feels the full impact of the conspiracy strategy. Strictly, the prosecution should first establish *prima facie* the conspiracy and identify the conspirators, after which evidence of acts and declarations of each in the course of its execution are admissible against all. But the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed.

The defendants in this case were faced with similar problems.

Apropos also is Mr. Justice Jackson's observation that "there generally will be evidence of wrongdoing by somebody." Id. at 454, 69 S.Ct. at 723. Indeed it can be said that the evidence here indicates that each defendant was guilty of some kind of wrongdoing. But a conviction should not stand if there is a substantial variance between the charge and the proof or if it is based even in part upon immaterial, prejudicial evidence.

In summary, the convictions in this case should be set aside for different reasons, as to the defendants Hyman, Kovens, and Strate because of the variance in the proof, as to the defendant Weinblatt because of the insufficiency of the evidence, and as to the defendants Hoffa, Dranow, and Burris because of reversible trial errors. With regret and reluctance, I am impelled also to say that an intense study of the record convinces me that this prosecution was designed to charge a sprawling, amorphous scheme and conspiracy, in order to allow the presentation of a series of confusing, complex transactions and to abet the introduction of a mass of immaterial, prejudicial evidence. If a person is to

be prosecuted and punished for his misdeeds, he should be charged with a specific crime and convicted by proper evidence. Moreover, every defendant in a criminal case is entitled to the fundamentals of a fair trial, free of the prejudicial errors that occurred in this case.